**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
AMERICAN ASSOCIATION OF                    )
POLITICAL CONSULTANTS                      )
                                           )
RIDDER/BRADEN, INC.                        )
                                           )        Civil Case No. _____
                        Plaintiffs,        )
                                           )
v.                                         )
                                           )
UNITED STATES                              )
SMALL BUSINESS ADMINISTRATION,             )
                                           )
-and-                                      )
                                           )
JOVITA CARRANZA                            )
*In her Official Capacity as*              )
*Administrator of the*                     )
*U.S. Small Business Administration*       )
                                           )
                        Defendants.        )
_____ )

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Association of Political Consultants, on behalf of its members and Ridder/Braden, Inc., (collectively, "Plaintiffs") bring this action for declaratory and injunctive relief, against the Small Business Administration ("SBA") and Jovita Carranza, in her official capacity as Administrator of the SBA, (collectively, "Defendants") and complain as follows:

## INTRODUCTION

1.      In response to the devastating effect that government measures to combat the COVID-19 virus have had on the United States economy, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") established the Paycheck Protection Program

("PPP") Loans. These Loans, which are administered and guaranteed by the SBA, assist small businesses with expenses such as payroll, health insurance, and rent expenses during the COVID-19 emergency and permit some recipients to qualify for loan forgiveness. Due to SBA regulations, however, businesses primarily engaged in political or lobbying activities are ineligible for PPP loans (hereinafter the "Political Speech Prohibition"), despite the dire need for economic relief. 13 C.F.R. 120.110(r).

2.      Denial of such important and valuable economic relief based on an otherwise eligible recipient's political or civic involvement clearly violates free speech and equal protection. Specifically, the Political Speech Prohibition violates the First Amendment because it constitutes an unconstitutional condition on speech as well as a content-based speech ban. Excluding businesses primarily engaged in political speech activities from the PPP also deprives them of equal protection in violation of the Fifth Amendment because other similarly situated businesses are eligible for those loans. Such violations are made ever so much more egregious given the dire economic straits resulting from the COVID-19 measures prescribed by the government.

3.      Accordingly, Plaintiffs bring an as-applied challenge against the SBA seeking declaratory and injunctive relief to prohibit the SBA from excluding Plaintiffs and other businesses primarily engaged in political and lobbying activity from PPP loans.

## PARTIES

4.      The American Association of Political Consultants ("AAPC") is a trade association organized under 26 U.S.C. § 501(c)(6).

5.      AAPC was founded in 1969 and is a multi-partisan organization consisting of political and public affairs professionals. AAPC has over 1,500 members making it the

largest association of political and public affairs professionals. Members include political consultants, media consultants, pollsters, campaign managers, corporate public affairs officers, professors, fund-raisers, congressional staffers, vendors, and lobbyists.

6.    AAPC's membership includes individuals who engage in the political process at varying levels, ranging from local to national politics, and everything in-between. AAPC has its headquarters in McLean, Virginia. Many AAPC members are ineligible for PPP.

7.    AAPC member GR Pro, LLC is a multi-member limited liability company incorporated in Oklahoma. Robinson Aff. at ¶¶ 2, 4 (attached hereto as Exhibit D). GR Pro, LLC is a full-service political consulting firm providing services to its clients at the federal, state, and local level. *Id*. at ¶ 3. GR Pro, LLC focuses its efforts at advancing its clients' candidacies for office and ballot measures, and occasionally engages in lobbying. *Id*. GR Pro, LLC is a member of the AAPC. *Id*. at ¶ 6. GR Pro, LLC has already been forced to let go of a portion of their independent contractors due to the economic turmoil created by COVID-19 measures. *Id*. at ¶ 8. Absent a PPP loan, GR Pro, LLC will suffer even greater financial hardship. *Id*. at ¶ 9. GR Pro, LLC intends to apply for a loan through PPP. *Id*. at ¶¶ 10, 15. GR Pro, LLC has not yet applied because it is ineligible due to the SBA's Political Speech Prohibition. *Id*. GR Pro, LLC is otherwise eligible to participate in PPP. *Id*. at ¶¶ 18-21.

8.    Plaintiff Ridder\Braden, Inc. is a political consulting firm that occasionally engages in lobbying, in Denver, Colorado. Ridder Aff. at ¶¶ 2-3 (attached hereto as Exhibit E). Ridder\Braden, Inc., performs primarily general political consulting services and public opinion polling services to candidates and ballot measures at the federal, state, and local

levels. *Id*. at ¶¶ 2-3, 5. In addition, a small amount of the firm's business is general public affairs. One of its owners is currently a Colorado registered lobbyist for the Rocky Mountain Wolf Action Fund. *Id*. at ¶ 4. Ridder\Braden, Inc., focuses its business at advancing its clients' candidacies for office and ballot measures, and policy goals. Ridder\Braden, Inc. is also a member of the AAPC. *Id*. at ¶ 7. Ridder\Braden, Inc. has already been forced to reduce their use of independent contractors due to the economic turmoil created by COVID-19 measures. *Id*. at ¶ 9. Absent a PPP loan, Ridder\Braden, Inc. will suffer even greater financial hardship. *Id*. at ¶ 10. Ridder\Braden, Inc. intends to apply for a loan through PPP. *Id*. at ¶¶ 11, 16. Ridder\Braden, Inc. has not yet applied because it is ineligible due to the SBA's Political Speech Prohibition. *Id*. at ¶ 11. Ridder\Braden, Inc. is otherwise eligible to participate in PPP. *Id*. at ¶¶ 12-13, 19-22.

9.     Defendant SBA is tasked with assisting and protecting the interests of small businesses by providing financial, contractual, and business development assistance, particularly when small businesses are victims of a disaster. 13 C.F.R. § 101.100. The SBA is headed by an Administrator who is appointed by the President of the United States and confirmed by the United States Senate. 13 C.F.R. § 101.101(a). Importantly here, the SBA is vested with the authority to administer the PPP. 13 C.F.R. § 120.1 *et seq*.; CARES Act, Pub. L. No. 116-136, §1102, 1006 134 Stat. 281 (2020).; *see also* Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program*, Docket No. SBA-2020-0015 at 1 (Apr. 2, 2020) (attached as Ex. A).

10.     Defendant Jovita Carranza is the Administrator of the SBA. Ms. Carranza exercises "direction, authority, and control over SBA." Ms. Carranza both determines and

approves all of SBA's programs to provide aid and assistance to small businesses in the United States. 13 C.F.R. § 101.101(a)(1-2).

## JURISDICTION

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case presents a federal question. Defendants' action prohibiting businesses that primarily engaged in political and lobbying activity from receiving loans that the SBA oversees, violates the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

12.     This Court also has jurisdiction pursuant to 15 U.S.C. § 634(b)(1) which vests jurisdiction in any United States District Court to adjudicate cases against the Administrator of the SBA.

13.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(1)(A) because the SBA has its headquarters in the District of Columbia. *See* 13 C.F.R. § 101.102 (establishing SBA's headquarters in Washington, D.C.).

## FACTUAL ALLEGATIONS

14.     As the night of an old decade turned to the dawn of a new decade, a novel virus began to circumnavigate the globe.

15.     In the waning days of 2019, what is now known as the novel Coronavirus disease 2019 ("COVID-19") struck its first victims in the city of Wuhan, Hubei Province, China.[1]

---

[1] *See* Covid-19 Data Visualization Center, *New Cases of COVID-19 in World Countries* (Apr. 11, 2020) *available at* https://coronavirus.jhu.edu/data/new-cases.

16.     Then, in early January 2020 this mysterious, insidious, and pernicious virus surreptitiously slipped out of China and into Thailand and Japan, infecting more victims.[2]

17.     On January 15, 2020 the World Health Organization ("WHO") declared an outbreak of this novel virus and warned countries in Asia to be prepared to combat this virus. The WHO also identified this mysterious virus for the first time as COVID-19.[3]

18.     Approximately, one week later, this insidious disease landed on American soil.[4]

19.     Three days after that, COVID-19 struck Europe.[5]

20.     On January 25, 2020, The WHO began sounding the alarm throughout the Mediterranean region. Four days later, The United Arab Emirates reported its first confirmed COVID-19 victims. Highlighting the insidious nature of this pernicious disease,

---

[2] *See* U.S. Department of Health and Human Services, *Public Health Screening to Begin at 3 U.S. Airports for 2019 Novel Coronavirus* (Jan. 17, 2020) *available at* https://www.cdc.gov/media/releases/2020/p0117-coronavirus-screening.html; *see also* World Health Organization, *WHO statement on novel coronavirus in Thailand* (Jan. 13, 2020) *available at* https://www.who.int/news-room/detail/13-01-2020-who-statement-on-novel-coronavirus-in-thailand.

[3] *See* World Health Organization, *Coronavirus outbreak shows Asia needs to step up infection preparation* (Jan. 15, 2020) *available at* https://www.who.int/westernpacific/news/commentaries/detail-hq/coronavirus-outbreak-shows-asia-needs-to-step-up-infection-preparation; *see also* World Health Organization, *Mission Summary: WHO Field Visit to Wuhan, China 20-21 January 2020* (Jan. 22, 2020) *available at* https://www.who.int/china/news/detail/22-01-2020-field-visit-wuhan-china-jan-2020.

[4] *See supra* n.1.

[5] *See* World Health Organization, *WHO's Eastern Mediterranean Region Scales Up Preparedness for Novel Coronavirus* (Jan. 27, 2020) *available at* http://www.emro.who.int/media/news/whos-eastern-mediterranean-region-scales-up-preparedness-for-novel-coronavirus.html.

the WHO identified that some victims of COVID-19 were asymptomatic, meaning the virus was capable of spreading stealthily.[6]

21.    Approximately five days later Spain, Italy, and the United Kingdom reported their first COVID-19 victims.[7]

22.    On February 24, 2020, with 35 Americans testing positive for COVID-19, President Trump requested that Congress appropriate $1.25 billion in funds to prepare for a COVID-19 outbreak.[8]

23.    By the beginning of March 2020, COVID-19 had expanded its reach throughout the world and infected 100,000 people.[9]

24.    On March 11, 2020, as the number of COVID-19 cases worldwide surpassed 118,000, with victims in 114 countries, the WHO declared COVID-19 a global pandemic.[10]

25.    Two days later, on March 13, 2020, after this insidious and pernicious virus had struck 2,224 Americans, President Trump declared a national emergency.[11]

---

[6] *See* World Health Organization, *WHO confirms first cases of novel coronavirus (2019-nCoV) in the Eastern Mediterranean Region* (Jan. 29, 2020) *available at* http://www.emro.who.int/media/news/who-confirms-first-cases-of-novel-coronavirus-2019-ncov-in-the-eastern-mediterranean-region.html.

[7] *See supra* n.1.

[8] *See* Derrick Taylor, *The Trump Administration Asks Congress for $1.25 Billion For Coronavirus Response*, N.Y. Times (Apr. 7, 2020) *available at* https://www.nytimes.com/article/coronavirus-timeline.html.

[9] *See* World Health Organization, *WHO Statement on Cases of COVID-19 Surpassing 100 000* (Mar. 7, 2020) *available at* https://www.who.int/news-room/detail/07-03-2020-who-statement-on-cases-of-covid-19-surpassing-100-000.

[10] *See* World Health Organization, *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 - 11 March 2020*, *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[11] *See* President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020)

26.     Then, on March 17, 2020, President Trump declared that, for a period of 15 days, gatherings of 10 or more people would be discouraged.[12]

27.     The White House in collaboration with the Centers for Disease Control and Prevention ("CDC") published guidelines for how people should conduct themselves during the following 15 days. Included within these guidelines was the recommendation that, in areas where community spread of COVID-19 is present, "bars, restaurants, food courts, gyms, and other indoor and outdoor venues where groups of people congregate should be closed." (attached as Exhibit C). Additionally, individuals should avoid discretionary travel, including shopping trips and social visits. *Id.*

28.     The CDC has recommended that people maintain a safe social distance of *at least six feet*.[13] This is because contact with a person within six feet can facilitate transmission of COVID-19.

29.     State governments have issued orders requiring various businesses to close or substantially curtail operations.

_____

*available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. *See also* Jordain Carney, *Coronavirus pushes GOP's Biden-Burisma probe to back burner*, The Hill (Mar. 29, 2020) https://thehill.com/homenews/senate/489950-coronavirus-pushes-gops-biden-burisma-probe-to-back-burner.

[12] *See* The White House, *The President's Coronavirus Guidelines for America: 15 Days to Slow the Spread, available at* https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Mar. 19, 2020).

[13] *See* Centers for Disease Control and Prevention, *Interim U.S. Guidance for Risk Assessment and Public Health Management of Healthcare Personnel with Potential Exposure in a Healthcare Setting to Patients with Coronavirus Disease (COVID-19)* (Mar. 7, 2020) *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-risk-assessment-hcp.html.

30.     For example, on March 12, 2020 Governor Northam of the Commonwealth of Virginia declared a State of Emergency. In his "Declaration Of A State Of Emergency Due To Novel Coronavirus (Covid-19)," Governor Northam declared that COVID-19 is public health threat because it is a communicable disease.[14] Four days later on Monday, March 16, 2020, Governor Northam issued a directive stating that restaurants, fitness centers, and theaters either had to reduce capacity to 10 people or close.[15] On March 23, 2020, Governor Northam ordered all businesses to observe social-distancing practices and to not allow more than 10 people in the business at any one time. If that business could not adhere to those limitations, and it was not deemed an essential business, Governor Northam ordered the business closed. Governor Northam also encouraged businesses that could do so to telework as much as possible.[16] Then, on March 30, Governor Northam issued a "stay at home order" for all Virginians.[17]

---

[14] *See* Governor Ralph Northam, *Executive Order No. 51 (2020) DECLARATION OF A STATE OF EMERGENCY DUE TO NOVEL CORONAVIRUS (COVID-19)* (Mar. 12, 2020) *available at* https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/eo/EO-51-Declaration-of-a-State-of-Emergency-Due-to-Novel-Coronavirus-(COVID-19).pdf.

[15] *See* Governor Ralph Northam, *Governor Northam Announces New Measures to Combat COVID-19 and Support Impacted Virginians* (Mar. 17, 2020) *available at* https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854487-en.html.

[16] *See* Governor Ralph Northam, *Executive Order No. 53, Temporary Restrictions on Restaurants, Recreational, Entertainment, Gatherings, Non-Essential Retail Businesses, and Closure of K-12 Schools Due to Novel Coronavirus (Covid-19)* (Mar. 23, 2020) *available at* https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf.

[17] *See* Governor Ralph Northam, *Executive Order No. 55, Temporary Stay at Home Order Due to Novel Coronavirus (Covid-19)* (Mar. 30, 2020) *available at* https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf.

31.     Also on March 16, Mayor Muriel Bowser of the District of Columbia issued an order prohibiting all gatherings of 50 or more people. Mayor Bowser also ordered all restaurants, gyms, nightclubs, spas, and theatres to close.[18] On March 24, 2020, Mayor Bowser ordered all non-essential business to close.[19]

32.     Also on March 24, 2020, Governor J. Kevin Stitt of Oklahoma declared a state of emergency for Oklahoma and ordered all non-critical businesses to close.[20]

33.     The following day, on March 25, Governor Jared Polis of Colorado ordered all non-critical businesses to close.[21] Governor Polis has ordered non-critical businesses to remain closed until April 26, 2020.[22]

---

[18] *See* Mayor Muriel Bowser, *Prohibition on Mass Gatherings During Public Health Emergency* (Mar. 16, 2020) *available at* https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/publication/attachments/MO-Prohibition-on-Mass-Gatherings-During-Public-Health-Emergency.pdf.

[19] *See* Mayor Muriel Bowser, *Closure of Non-Essential Businesses and Prohibition on Large Gatherings During Public Health Emergency for the 2019 Novel Coronavirus (COVID-19)* (Mar. 24, 2020) *available at* https://coronavirus.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-053%20Closure%20of%20Non-Essential%20Businesses%20and%20Prohibiti....pdf.

[20] *See* Governor Kevin Stitt, *Fourth Amended Executive Order 2020-07* (Mar. 24, 2020) *available at* https://www.sos.ok.gov/documents/executive/1919.pdf.

[21] *See* Governor Jared Polis, *Executive Order D 2020-17 Ordering Coloradans to Stay at Home Due to the Presence of COVID-19 in the State* (Mar. 25, 2020) *available at* https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20017%20Ordering%20Coloradans%20to%20Stay%20at%20Home_0.pdf.

[22] *See* Governor Jared Polis, *Executive Order D 2020-24 Amending and Extending Executive Order D 2020 017 Ordering Coloradans to Stay at Home Due to the Presence of COVID-19* (Apr. 6, 2020) *available at* https://www.colorado.gov/governor/sites/default/files/inline-files/D%202020%20024%20Amending%20and%20Extending%20Executive%20Order%20D%202020%20017%20Stay%20at%20Home%20Order_0.pdf.

34.     As of April 13, 2020, this insidious and pernicious virus has infected 557,663 Americans and killed 22,116 Americans.[23]

35.     But COVID-19 is not just ravaging the health of Americans, it is also ravaging the Nation's economy.

36.     On January 22, 2020, approximately the day that the first case of COVID-19 was reported in the United States, the Dow Jones Industrial Average closed at 29,186.27, and the unemployment rate was at 3.6 percent.[24]

37.     But by Friday April 3, 2020, 41 states and the District of Columbia had issued stay-at-home orders, meaning 316 million Americans have been ordered to stay at home and not go to work.[25]

38.     Accordingly, on Thursday, April 9, 2020, the Dow Jones Industrial Average had dropped to 23,719.37.[26] Furthermore, between March 19 and April 9, 2020, the number of Americans filing for unemployment increased to approximately seventeen million.[27]

---

[23] *See supra* n.1.

[24] *See* Fred Imbert, *Stocks Close Little Changed, IBM Leads Tech Shares Higher,* CNBC (Jan. 24, 2020) *available at* https://www.cnbc.com/2020/01/22/us-futures-point-to-higher-open.html; *see also* U.S. Bureau of Labor and Statistics, *Unemployment Rate 2.0 Percent For College Grads, 3.8 Percent For High School Grads In January 2020* (Feb. 12, 2020) *available at* https://www.bls.gov/opub/ted/2020/unemployment-rate-2-percent-for-college-grads-3-8-percent-for-high-school-grads-in-january-2020.htm.

[25] See Sarah Mervosh, *Which States and Cities Have Told Residents to Stay at Home,* N.Y. Times (Apr. 7, 2020) *available at* https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[26] *See Dow Jones Industrial Average,* Wall Street Journal, *available at* https://www.wsj.com/market-data/quotes/index/DJIA/historical-prices (last visited Apr. 11, 2020).

[27] *See* Jim Zarroli, *Jobs Carnage Mounts: 17 Million File For Unemployment In 3 Weeks*, National Public Radio (Apr. 9, 2020) *available at* https://www.npr.org/sections/coronavirus-live-updates/2020/04/09/830216099/6-6-million-more-file-for-unemployment-as-coronavirus-keeps-economy-shut.

39.     On March 27, 2020, to provide a much-needed jolt to the American economy, which had been ravaged by COVID-19, President Trump and Congress collaborated to enact the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). The purpose of the CARES Act was "to provide immediate assistance to individuals, families, and businesses affected by the COVID-19 emergency." SBA Business Loan Program Temporary Changes; Paycheck Protection Program at 4 (Interim Final Rule Apr. 2, 2020) (to be codified at 13 C.F.R. pt. 120) (attached hereto as Exhibit A).

40.     Congress vested the SBA with authority "to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency." Ex. A at 3.

41.     Included in the Act is the PPP. Congress established this program to provide economic relief to small businesses nationwide adversely impacted under the COVID-19 Emergency Declaration issued by President Trump on March 13, 2020."[28]

42.     The SBA stated that due to the various health emergencies declared across the Nation, including the stay-at-home orders state governments had ordered, "small businesses nationwide are experiencing economic hardship . . ." Ex. A at 2. The various measures, including safe distance mandates, are decreasing economic activity for a host of businesses. Ex. A at 3.

43.     The SBA received from Congress $349 billion to "guarantee loans under the [PPP] through June 30, 2020." Congress's intent with this program "is that SBA

---

[28] *See* Administrator Jovita Carranza, *Business Loan Program Temporary Changes; Paycheck Protection Program* (Apr. 2, 2020).

provide relief to America's small businesses expeditiously." Ex. A at 5. Small businesses are allowed to borrow up to $10 million unless the business, using a payroll-based formula, arrives at a lower number. Ex. A at 8-9.

44.     The SBA guarantees 100 percent of the loans provided through the PPP. Additionally, recipients *can qualify* for up to 100 percent loan forgiveness after applying for the forgiveness and the SBA approves the request. Ex. A at 3.

45.     Loan recipients can use loans through the PPP to help pay the following costs:

   a.     Payroll costs;

   b.     costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;

   c.     employee salaries, commissions, or similar compensations;

   d.     payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation;

   e.     rent (including rent under a lease agreement);

   f.     utilities; and

   g.     interest on any other debt obligations that were incurred before the covered period.

CARES Act, Pub. L. No. 116-136, §1102(a)(2)(F)(i), 134 Stat. 281 (2020).

46.     Lenders can rely on certifications of borrowers to determine eligibility for loans under this program. Ex. A at 5.

47.    The CARES Act proclaims that, "in addition to small business concerns, *any business concern*, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan . . ." CARES Act, Pub. L. No. 116-136, §1102(a)(1)(B)(2)(D)(i), 134 Stat. 281 (2020).

48.    To be eligible for this program, a business must:

    a.    have 500 employees or less; and

    b.    have a principal place of business is in the United States; or

    c.    operate a business within a certain industry that meets the SBA's size standards for that industry; and

    d.    have been in operation on February 15, 2020 and had employees or independent contractors that the business was paying;

49.    Entities that are eligible for PPP include sole proprietorships, Non-profit entities that are organized under 501(c)(3) of the Internal Revenue Code, tax-exempt veterans entities organized under 501(c)(19) of the Internal Revenue Code, and Tribal businesses organized under Section 31(b)(2)(C) of the Small Business Act. Ex. A at 5-6.

50.    A small business is not eligible if it conducts illegal business under federal, state, or local law, employs nannies and/or housekeepers, an owner of 20 percent or more equity is incarcerated, on probation or parole, is subject to indictment, or was convicted of a felony within the last five years, or the business has obtained a federally guaranteed loan that is not currently delinquent or within the past seven years, the business has defaulted on the loan. Ex. A at 7.

51.    Importantly for Plaintiffs, a small business is also not eligible for the PPP if it is identified in 13 C.F.R. § 120.110. Ex. A at 8.

52.   Businesses that are identified in that section include, but are not limited to:

   a.   Non-profit businesses;

   b.   Private clubs and businesses which limit the number of memberships for reasons other than capacity;

   c.   Businesses principally engaged in teaching, instructing, counseling or indoctrinating religion or religious beliefs, whether in a religious or secular setting;

   d.   Businesses that present live performances of a prurient sexual nature or derive "directly or indirectly more than *de minimis* gross revenue through the sale" of items of a prurient sexual nature; and

   e.   *Businesses primarily engaged in political or lobbying activities*.

   13 C.F.R. § 120.110 (emphasis added).

53.   However, Congress, through the CARES Act, superseded the SBA's prohibition on certain non-profits receiving loans. *See* 13 C.F.R. § 120.110(a). Under the CARES Act, 501(c)(3)'s, veterans' groups, and Tribal businesses are eligible to receive loans. Ex. A at 6.

54.   Additionally, on Friday April 3, 2020, the SBA issued additional guidance concerning its prohibition on allowing loans to churches. (attached as Exhibit B). Exercising its authority "to modify existing loan programs and establish a new loan program," the SBA exempted church organizations from the SBA's affiliation rules that would otherwise make some churches too large to qualify for PPP or otherwise be prohibited from receiving loans. Ex. B at 6-7, 9. This exemption was necessitated under the Religious Freedom Restoration Act. *Id.* at 6.

55.     Furthermore, the Administrator determined that the SBA did not have a compelling interest "in denying emergency assistance to faith-based organizations that are facing the same economic hardship to which the CARES Act responded and who would be eligible for PPP but for their faith-based organizational and associational decisions." Ex. B at 8.

56.     Accordingly, the Administrator has decided to exempt from application of SBA's affiliation rules faith-based organizations that would otherwise be disqualified from participation in PPP because of affiliations that are a part of their religious exercise. Ex. B at 10.

57.     But Plaintiff AAPC's members and Plaintiff Ridder/Braden, Inc. here are still prohibited from receiving funds through the PPP due to the SBA's regulatory prohibition on giving loans to entities whose "Businesses [are] primarily engaged in political or lobbying activities." 13 C.F.R. 120.110(r).

58.     Plaintiffs fully intend to apply for loans under the SBA's Paycheck Protection Program but for the SBA's Political Speech Prohibition codified at 13 C.F.R. § 120.110(r).

59.     If Plaintiffs are unable to participate in PPP and the CARE Act's other loans, Plaintiffs will be forced to abstain or substantially limit the exercise their constitutional right to freedom of speech, particularly speech in the height of political campaigns, and their right to petition government. Not only is this an injury to Plaintiffs, but it is an injury to society as a whole, because speakers will be forced out of the marketplace of ideas. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

60. That Plaintiffs are still permitted to personally lobby, or speak in political campaigns, outside of their businesses does not address the harm that they suffer here. The SBA's speech activities ban, especially now during an economic crisis unprecedented since the Great Depression, deprives Plaintiffs of the most effective way to petition government and promote candidates for office, namely through speech on behalf of their clients. *See Autor v. Pritzker,* 740 F.3d 176, 183 (D.C. Cir. 2014).

## STATEMENT OF APPLICABLE LAW

61. "Premised on a mistrust of governmental power," the First Amendment declares, under no uncertain terms, that "Congress shall make no law… abridging the freedom of speech." U.S. Const. amend. I; *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). The First Amendment prohibits any law that "stands against attempts to disfavor certain subjects or viewpoints." *Citizens United*, 558 U.S. at 340.

62. Speech about public issues "[i]s at the heart of the First Amendment's protection," and therefore, speech concerning salient issues is constitutionally enshrined because it is "the type of speech [that is] indispensable to decision making in a democracy." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776-77 (1978). *See also Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 223 (1989) ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.") (internal quotation omitted); *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."); *Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement

that a major purpose of that Amendment was to protect the free discussion of governmental affairs.").

63.     Statutes that regulate activity based on the content of the speaker's speech are presumptively unconstitutional. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). A regulation is content-based if it requires "enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (internal quotation marks omitted).

64.     When a statute imposes a regulation that is based on the content of the speaker's speech, it is of no constitutional significance whether the statute is a complete prohibition or a limitation. The statute is still presumptively unconstitutional and subject to strict scrutiny. *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 510 (D.C. Cir. 2016) (citing and quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812 (2000).

65.     Furthermore, the government cannot grant benefits on the condition that you abandon your right to free speech and association. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 597 (1972) ("For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly.").

66.     Stated more succinctly, "[t]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (internal quotation marks omitted, alteration in the

original). "The First Amendment supplies a limit on Congress' ability to place conditions on the receipt of funds." *Id.*

67.     For example, the First Amendment prohibits the provision of federal aid to a noncommercial radio station on the condition the radio station never editorialize. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399-401 (1984).

68.     The First Amendment also declares, in no uncertain terms that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

69.     Lobbying and political activities are constitutionally protected activities under the First Amendment's right to petition government. This constitutionally protected right to lobby endures even when the lobbyist receives compensation. *Autor*, 740 F.3d at 182; *Citizens United*, 558 U.S. at 339-40 (stating that political speech, especially in the height of political campaigns, is essential to decision-making in our constitutional republic).

70.     In the analogous context of granting tax exempt status to entities, "the discriminatory denial of tax exemptions can impermissibly infringe free speech." *Big Mama Rag v. United States*, 631 F.2d 1030, 1034 (D.C. Cir. 1980) (citing *Speiser v. Randall*, 357 U.S. 513, 518 (1958).

## CLAIM I
### *Violation of the Free Speech Clause of the First Amendment to the U.S. Constitution*

71.     Plaintiffs incorporate by reference paragraphs 1-70 as if fully restated herein.

72.     Statutes that regulate activity based upon the content of the speaker's speech are presumptively unconstitutional. *Reed*, 135 S. Ct. at 2226. A regulation is content-based

if it requires "enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen*, 573 U.S. at 479 (internal quotation marks omitted).

73.     When a statute imposes a regulation that is based on the content of the speaker's speech, it is of no constitutional significance whether the statute is a complete prohibition or a limitation. The statute is still presumptively unconstitutional and subject to strict scrutiny. *Pursuing America's Greatness*, 831 F.3d at 510.

74.     Accordingly, statutes that act as a prohibition on non-candidate committees from using the name of a candidate in their official committee name is an unconstitutional content-based speech prohibition. *Pursuing America's Greatness*, 831 F.3d at 510-11; *Pursuing America's Greatness v. FEC*, 363 F. Supp. 3d 94 (D.D.C. 2019).

75.     Similarly, statutes that prohibit robocalls that are "of a political nature including, but not limited to, calls relating to political campaigns" are an unconstitutional content-based speech prohibition. *Cahaly v. LaRosa,* 796 F.3d 399, 402-06 (4th Cir. 2015).

76.     This is not the first time the SBA has enacted a content-based speech prohibition that a federal court has declared unconstitutional.

77.     In 1983, plaintiffs brought a First Amendment challenge to an SBA regulation known as the "opinion molder rule." *Mission Trace Invs., Ltd. v. SBA*, 622 F. Supp. 687, 688 (D. Colo. 1985) *rev. on other grounds sub. nom. Ascot Dinner Theatre, Ltd. v. Small Business Admin.*, 887 F.2d 1024 (10th Cir. 1989). Similar to the SBA's current political and lobbying activity prohibition, the "opinion molder rule" stated the following:

> Financial assistance will not be granted by SBA . . . if the applicant is engaged in the creation, origination, expression, dissemination, propagation, or distribution of ideas, values, thoughts, opinions or similar intellectual property, regardless of medium, form or content. Financial

assistance to such applicants is barred in order to avoid Government
interference, or the appearance thereof, with the constitutionally protected
freedoms of speech and press.

*Mission Trace Invs., Ltd*., 622 F. Supp. at 689 (quoting 13 C.F.R. § 120.2(d)(4)(1985).

78.     After concluding that the "opinion molder rule" "completely deprives
otherwise qualified applicants of all their potential SBA benefits solely because they
engage in constitutionally protected activity[]" *id*. at 696, the court turned then to analyze
whether the "opinion molder rule" was an unconstitutional content-based speech
prohibition." *Id*.

79.     The court concluded that the "opinion molder rule" constituted a content-
based speech ban. *Id*. at 697 ("[T]he opinion molder rule discriminates against expression
because of the content of that expression."). The "opinion molder rule" constituted a
content-based speech ban even though it banned an entire topic of speech without taking a
position within that topic. *Id*. Furthermore, to enforce the "opinion molder rule," the rule
"requires the SBA to examine the content of a loan applicant's speech." *Id*.

80.     Noting that the SBA's "opinion molder rule" permits commercial
advertising, the court ruled that the First Amendment does not permit favoritism between
commercial speech and speech that promotes ideas. *Id*. at 699. The court concluded that
"the opinion molder rule inhibits important media of public expression because of the
content or viewpoints of the messages expressed."

81.     After balancing the interests under constitutional scrutiny, the court held
that the "opinion molder rule" violated the First Amendment. *Id*. at 702. The court
concluded that "[a]n agency established to promote economic well-being by assisting
viable small businesses may not deny benefits to applicants solely because they engage in

constitutionally protected expression." *Id*. The SBA did not challenge this holding on appeal and the Tenth Circuit did not review it. *Ascot Dinner Theatre,* 887 F.2d at 1026.

82.     Now, making a similar mistake, the SBA has declared that its loans are not eligible for "[b]usinesses [that are] primarily engaged in political or lobbying activities." 13 C.F.R. § 120.110(r).

83.     The SBA's Political Speech Prohibition constitutes a content-based speech ban because, to enforce it, the SBA must look to the content of Plaintiffs' speech, here lobbying and political activities. *McCullen*, 573 U.S. at 479.

84.     The SBA does not have a compelling interest to prohibit Plaintiffs' otherwise eligible small businesses from obtaining loans under the PPP.

85.     Furthermore, the SBA's means—a complete prohibition—are not narrowly tailored. Less intrusive means other than a complete ban do exist. *Pursuing America's Greatness*, 831 F.3d at 510; *League of Women Voters of Cal.*, 468 U.S. at 400-01 (stating that if the federal government granted federal dollars to non-commercial radio stations on the condition that the federal funds not be used for electioneering, but the radio station could use private funds for electioneering, such a grant system would be constitutional).

86.     Accordingly, the SBA's Political Speech Prohibition is an unconstitutional content-based speech prohibition.

## CLAIM II
### Violation of Unconstitutional Conditions Doctrine of the First Amendment to the U.S. Constitution

87.     Plaintiffs incorporate by reference paragraphs 1-86 as if fully restated herein.

88.     The First Amendment declares, under no uncertain terms that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

89.     Lobbying and political speech are constitutionally protected activities under the First Amendment's right to petition government. This constitutionally protected right to lobby endures even when the lobbyist receives compensation. *Autor*, 740 F.3d at 182.

90.     Although the government has the authority to appropriate funds, Art. I, §8, cl. 1., the "First Amendment supplies a limit on Congress' ability to place conditions on the receipt of funds." *Agency for Int'l Dev.*, 570 U.S. at 214.

91.     Accordingly, the government cannot grant benefits on the condition that a speaker abandon his or her right to free speech and association. *See, e.g., Perry,* 408 U.S. at 597.

92.     Stated more succinctly, "[t]he Government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev.*, 570 U.S. at 214 (internal quotation marks omitted, alteration in the original).

93.     For example, the First Amendment prohibits the conditioning of a noncommercial radio station receiving *any* federal aid that the radio station must never editorialize. *League of Women Voters of Cal.*, 468 U.S. at 399-401.

94.     Here, as a condition of receiving a loan through the PPP, administered by the SBA, Plaintiffs must not be "Businesses [that are] primarily engaged in political or lobbying activities." 13 C.F.R. § 120.110(r).

95.     But Plaintiffs are exercising their First Amendment rights by lobbying on behalf of clients and consulting on political speech made in the height of campaigns. But for exercising their constitutional rights, Plaintiffs are otherwise eligible to receive loans through the PPP.

96.     The SBA does not provide Plaintiffs with any alternative means to obtain resources in light of government imposed economic shutdowns. Plaintiffs cannot restructure their corporate affairs in such a manner as to obtain these necessary funds because, in the final analysis, Plaintiffs' businesses are still primarily engaged in political and lobbying activity. *Regan v. Taxation With Representation,* 461 U.S. 540, 544 (1983) (holding that lobbying prohibition for entities organized under 501(c)(3) of the Tax Code is not an unconstitutional condition because the plaintiff could establish a dual corporate structure where plaintiff could receive tax-deductible contributions for its non-lobbying work activities and a separate entity for its lobbying activity).

97.     The SBA cannot condition the grant of its loans through the PPP on the basis of Plaintiffs abandoning their constitutional right engaged in speech and petition related activities.

## CLAIM III
### *Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution*

98.     Plaintiffs incorporate by reference paragraphs 1-97 as if fully restated herein.

99.     The Due Process Clause of the Fifth Amendment declares that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Included within the Fifth Amendment's Due Process Clause are the same equal

protection principles contained in the Fourteenth Amendment's Equal Protection Clause. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

100.    "The injury in fact in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003).

101.    SBA's PPP is available to all businesses, including 501(c)(3) nonprofits, veterans organizations, and faith based groups. But, the SBA prevents businesses that engage primarily in political or lobbying activity from obtaining these loans. 13 C.F.R. § 120.110(r).

102.    Here, the SBA's Political Speech Prohibition treats differently those who are exercising their constitutional right to speak and petition government from those who are not. In fact, those who are exercising their constitutional right to speak and petition government are completely prohibited from obtaining these PPP loans. Other small businesses are not. This is an unconstitutional distinction prohibiting those who exercise fundamental constitutional rights from obtaining much needed loans while allowing those who do not exercise fundamental constitutional rights to obtain them. This violates the equal protection component of the Fifth Amendment's Due Process Clause. *Autor v. Blank*, 892 F. Supp. 2d 264, 273 (D.D.C. 2012) *rev.'d* 740 F.3d 176, 184 (2014) ("Because [Plaintiffs] have plausibly alleged that the ban denies them a benefit available to others on account of their exercise of a fundamental right, we must reverse the district court's dismissal of their equal protection claim as well.").

103.    Like other small businesses that are coping with the economic impact of COVID-19, Plaintiffs are in dire need of an infusion of funds. They are otherwise eligible

for loans through the PPP. The SBA prohibits Plaintiffs from obtaining this necessary cash infusion because Plaintiffs exercise their fundamental constitutional rights. This violates the equal protection component of the Fifth Amendment.

104.   "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972).

105.   A complete prohibition of political consultants and lobbyists from being able to obtain loans is not narrowly tailored. *League of Women Voters of Cal.*, 468 U.S. at 399-401. The government does not have a legitimate interest during this global pandemic in preventing small businesses from obtaining much needed cash to cover payroll and health insurance for their employees just because these small businesses exercise fundamental constitutional rights.

## PRAYER FOR RELIEF

A.   Pursuant to 28 U.S.C. §§ 2201 and 2202, declare unconstitutional the Paycheck Protection Program's Political Speech Prohibition contained in 13 C.F.R. § 120.110(r), as applied to Plaintiffs because the Political Speech Prohibition violates the First and Fifth Amendments to the U.S. Constitution.

B.   Enjoin all Defendants, their agents, and assigns from enforcing the Paycheck Protection Program's Political Speech Prohibition contained in 13 C.F.R. § 120.110(r) against all Plaintiffs.

C.   Award Plaintiffs reasonable attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d).

D.   Award all other relief that this Court deems just and necessary.

Respectfully submitted, April 13, 2020

/s/ Jason Torchinsky
Jason Torchinsky (D.C. Bar No. 976033)
jtorchinsky@hvjt.law
Jonathan Lienhard (D.C. Bar No. 501845)
jlienhard@hvjt.law
Shawn Sheehy (Va Bar No. 82630)*
ssheehy@hvjt.law
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Phone: (540) 341-8808
Fax: (540) 341-8809
*Counsel for Plaintiffs*
*Pro Hac Vice Application Forthcoming*
*\*\* Application for Admission to this Court Forthcoming*


Joseph E. Sandler (D.C. Bar No. 255919)
sandler@sandlerreiff.com
Sandler, Reiff, Lamb, Rosenstein & Birkenstock PC
1090 Vermont Ave., N.W. Suite 750
Washington, D.C. 20005
Telephone: 202 479 -1111
Fax: 202-479-1115
*Counsel for Plaintiffs*

## VERIFICATION OF PLAINTIFF
### (Pursuant to 28 U.S.C. § 1746

I Alana Joyce, verify under the penalties of perjury under the laws of the United States of America that the foregoing factual allegations relating to the American Association of Political Consultants are within my personal knowledge and are to the best of my knowledge true, complete, and correct.


Executed On April 13, 2020


Alana Joyce
Executive Director of American Association of Political Consultants

## CERTIFICATE OF SERVICE

I, Jason Torchinsky, hereby certify that on April 13, 2020, the foregoing has been filed via the CM/ECF system and by email to Emergency_Judge@dcd.uscourts.gov. By agreement of the parties, this filing was also sent via electronic mail and First Class Certified Mail to the Counsel for the Defendants listed below:

/s/ Jason Torchinsky
Jason Torchinsky

Chris Pilkerton
Eric Benderson
Office of General Counsel
U.S. Small Business Administration
409 3rd St, S.W.
Washington DC 20416
eric.benderson@sba.gov

David Morrell
Deputy Assistant Attorney General
Federal Programs Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
David.M.Morrell@usdoj.gov

James J. Gilligan
Special Litigation Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel: 202-514-3358
James.Gilligan@usdoj.gov

Timothy J. Shea
United States Attorney
District of Columbia
555 4th St NW,
Washington, DC 20530
202-252-7566