**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| AMERICAN ASSOCIATION OF ) | |
| POLITICAL CONSULTANTS ) | |
| ) | |
| RIDDER/BRADEN, INC. ) | |
| ) | Civil Case No. _____ |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES ) | |
| SMALL BUSINESS ADMINISTRATION, ) | |
| ) | |
| -and- ) | |
| ) | |
| JOVITA CARRANZA ) | |
| *In her Official Capacity as* ) | |
| *Administrator of the* ) | |
| *U.S. Small Business Administration* ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65 and LCvR 65.1, American Association of Political Consultants, Ridder/Braden, Inc. (collectively "Plaintiffs") move for an emergency Temporary Restraining Order and Preliminary Injunction against the United States Small Business Administration ("SBA") and Jovita Carranza, in her official capacity as Administrator of the SBA to enjoin them from enforcing 13 C.F.R. § 120.110(r) in a way that deprives business concerns or nonprofit organizations of eligibility for the Coronavirus Aid, Relief, and Economic Security Act's ("CARES Act") Paycheck Protection Program, CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) *et seq*., due to their political or lobbying activities.

The SBA has already begun administering loans through the Paycheck Protection Program. The Paycheck Protection Program is distributed on a "first-come, first served" basis. And Plaintiffs are in dire need of an infusion of funds given the economic fallout from COVID-19 measures. Accordingly, Plaintiffs bring this suit on an emergency basis because time is of the essence.

This motion is made on the grounds specified in this motion, Plaintiffs' brief in support thereof, the Verified Complaint, the Exhibits attached to the Verified Complaint, and such other and further evidence as may be presented to the Court at the time of the hearing.

Plaintiffs respectfully request oral argument because of the complexities and the important constitutional rights involved in this case. Pursuant to Local Rule 7(m), Plaintiffs have conferred with Counsel for the SBA who state that they oppose this motion.

WHEREFORE, Plaintiffs respectfully request that the Court grant the foregoing Motion, enter the proposed Temporary Restraining Order and/or Preliminary Injunction, and enter such other and further relief that it deems just and appropriate.

Respectfully submitted, April 13, 2020

/s/ Jason Torchinsky
Jason Torchinsky (D.C. Bar No. 976033)
Jonathan Lienhard (D.C. Bar No. 501845)
Shawn Sheehy (Va Bar No. 82630)*
HOLTZMAN VOGEL JOSEFIAK Torchinsky PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Phone: (540) 341-8808
Fax: (540) 341-8809
Counsel for Plaintiffs
*Pro Hac Vice Application Forthcoming

Joseph E. Sandler (D.C. Bar No. 255919)
sandler@sandlerreiff.com
Sandler, Reiff, Lamb, Rosenstein & Birkenstock PC
1090 Vermont Ave., N.W. Suite 750
Washington, D.C. 20005

Telephone: 202 479 -1111
Fax: 202-479-1115
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ )<br>AMERICAN ASSOCIATION OF )<br>POLITICAL CONSULTANTS )<br> )<br>RIDDER/BRADEN, INC. )<br> )<br>                    Plaintiffs, )<br> )<br>v. )<br> )<br>UNITED STATES )<br>SMALL BUSINESS ADMINISTRATION, )<br> )<br>-and- )<br> )<br>JOVITA CARRANZA )<br>*In her Official Capacity as* )<br>*Administrator of the* )<br>*U.S. Small Business Administration* )<br> )<br>                Defendants. )<br>_____ ) | Civil Case No. _____ |

**MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**INTRODUCTION**

COVID-19 and the government measures implemented to combat its spread have affected

nearly every business and employee nationwide. In response, Congress passed a series of measures

intended to combat the devastating effects on both employers and employees, including a series of

favorable small business loans. Tasked with administering these loans is the Small Business

Administration ("SBA"). However, the SBA's regulations do not permit it to lend to businesses

primarily engaged in political or lobbying activities. Accordingly, those businesses and their

employees are deprived of much-needed loans during the dire economic times the COVID-19

emergency created. Plaintiffs' businesses primarily engaged in political or lobbying activities are not immune from the financial hardships that COVID-19 has inflicted on the Nation. Rather, these businesses are acutely suffering the severe economic impacts of COVID-19.

The SBA's prohibition of businesses primarily engaged in political or lobbying activities from receiving emergency loans during the COVID-19 emergency is unconstitutional for three principal reasons. *First*, such a prohibition violates the unconstitutional conditions doctrine because it compels Plaintiffs to forego their fundamental constitutional rights to obtain a loan. *Second*, the prohibition is a content-based speech ban that cannot survive strict scrutiny. *Third*, the prohibition violates the equal protection principles contained in the Fifth Amendment because it treats lobbying and political businesses differently when they are in fact similarly situated to other small businesses. For these reasons, Plaintiffs seek an emergency temporary restraining order and/or a preliminary injunction.

Injunctive relief is warranted here because infringement of Plaintiffs' First and Fifth Amendment rights *per se* constitutes irreparable harm. Plaintiffs will also suffer crippling economic injury if they are prevented from accessing loans in such dire economic times. Unless this Court immediately grants the emergency relief requested herein, the Plaintiffs, and thousands of similarly situated businesses across the country along with their employees, will be irreparably harmed. Moreover, securing constitutional rights is in the public interest, and that interest will be furthered by granting Plaintiffs' requested injunctive relief here.

Accordingly, pursuant to Fed. R. Civ. P. 65 and LCvR 65.1, Plaintiffs submit this memorandum in support of their Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against the SBA and Jovita Carranza, in her official capacity as Administrator of the SBA.

## STATEMENT OF THE FACTS

As the world is now well aware, coronavirus disease 2019 ("COVID-19") is an infectious disease caused by severe acute respiratory syndrome coronavirus 2 ("SARS-CoV-2").[1] First reported in Wuhan, China, on the eve of New Year's Eve 2019, the virus quickly spread to other parts of Asia.[2] The World Health Organization ("WHO") declared an outbreak of the then-novel COVID-19 and warned countries in Asia to prepare to combat the virus.[3]

COVID-19 spread quickly and insidiously. In late January, COVID-19 landed on American soil.[4] At roughly the same time, the virus struck Europe, the Middle East, and other Mediterranean nations.[5] Also at that time, the WHO identified some victims of COVID-19 that were asymptomatic, highlighting the insidious nature of the disease.[6]

---

[1] *Naming the Coronavirus Disease (COVID-19) and the Virus that Causes it*, World Health Organization (last visited Apr. 11, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it.

[2] *See WHO Timeline – COVID-19*, World Health Organization (Apr. 8, 2020), https://www.who.int/news-room/detail/08-04-2020-who-timeline---covid-19; *Public Health Screening to Begin at 3 U.S. Airports for 2019 Novel Coronavirus*, Centers for Disease Control and Prevention (Jan. 17, 2020), https://www.cdc.gov/media/releases/2020/p0117-coronavirus-screening.html.

[3] *See Coronavirus Outbreak Shows Asia Needs to Step Up Infection Preparation*, World Health Organization (Jan. 15, 2020), https://www.who.int/westernpacific/news/commentaries/detail-hq/coronavirus-outbreak-shows-asia-needs-to-step-up-infection-preparation; *see also Mission Summary: WHO Field Visit to Wuhan, China 20-21 January 2020*, World Health Organization (Jan. 22, 2020), https://www.who.int/china/news/detail/22-01-2020-field-visit-wuhan-china-jan-2020.

[4] *See New Cases of COVID-19 In World Countries*, Johns Hopkins University & Medicine (last updated Apr. 10, 2020), https://coronavirus.jhu.edu/data/new-cases.

[5] *See id.*; *see also WHO's Eastern Mediterranean Region Scales Up Preparedness for Novel Coronavirus*, World Health Organization (Jan. 27, 2020), http://www.emro.who.int/media/news/whos-eastern-mediterranean-region-scales-up-preparedness-for-novel-coronavirus.html.

[6] *See WHO Confirms First Cases of Novel Coronavirus (2019-nCoV) in the Eastern Mediterranean Region*, World Health Organization (Jan. 29, 2020),

On February 24, with 35 Americans testing positive for COVID-19, President Trump requested that Congress appropriate $1.25 billion in funds to prepare for a COVID-19 outbreak.[7] Within three weeks, COVID-19 had infected over 2,000 Americans, the WHO officially declared the virus to be a global pandemic,[8] and President Trump declared a national emergency.[9] President Trump followed the national emergency declaration with recommendations discouraging gatherings of 10 or more people.[10] The White House, in collaboration with the Centers for Disease Control and Prevention ("CDC"), also published guidelines for how people should conduct themselves during the COVID-19 emergency. These guidelines included recommendations that, in areas where community spread of COVID-19 is present, "bars, restaurants, food courts, gyms, and other indoor and outdoor venues where groups of people congregate should be closed." Compl. ¶ 28. Additionally, the guidance encouraged people to avoid discretionary travel, including shopping trips and social visits. *Id.* And the CDC recommended social distancing, instructing people to maintain a distance of at least six feet from others, due to findings that transmission of COVID-19 can occur within six feet. Compl. ¶ 29.

---

http://www.emro.who.int/media/news/who-confirms-first-cases-of-novel-coronavirus-2019-ncov-in-the-eastern-mediterranean-region.html.

[7] Noah Weiland, Emily Cochrane, and Maggie Haberman, *White House Asks Congress For Billions To Fight Coronavirus*, N.Y. Times (Feb. 24, 2020), https://www.nytimes.com/2020/02/24/us/politics/trump-coronavirus-response.html.

[8] *See WHO Director-General's Opening Remarks at the Media Briefing on COVID-19*, World Health Organization (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[9] Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020), https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf.

[10] *See* Brian Naylor and Roberta Rampton, *Trump: Coronavirus Guidance Includes Avoiding Gatherings of More than 10 People*, National Public Radio (Mar. 16, 2020), https://www.npr.org/2020/03/16/816268413/white-house-to-give-update-on-coronavirus-plans-and-tests.

Various state governments have also taken dramatic measures to combat COVID-19. Many of these measures by states have significant economic impact. For example, on March 12, 2020, Governor Northam of the Commonwealth of Virginia declared a State of Emergency. Compl. ¶ 31. In his "Declaration Of A State Of Emergency Due To Novel Coronavirus (Covid-19)", Governor Northam declared that COVID-19 is a public health threat because it is a communicable disease. *Id.* Four days later on Monday, March 16, 2020, Governor Northam issued a directive stating that restaurants, fitness centers, and theatres either had to reduce capacity to no more than 10 people or close. *Id.* Governor Northam later extended this rule to all businesses and encouraged businesses to telework as much as possible. *Id.* These actions culminated on March 30, when Governor Northam issued a stay-at-home order. *Id.*

In another instance, on March 16, Mayor Muriel Bowser of the District of Columbia issued orders prohibiting all mass gatherings of 50 or more people. Mayor Bowser also ordered all restaurants, gyms, nightclubs, spas, and theatres to close. Compl. ¶ 32. On March 24, 2020, Mayor Bowser ordered all non-essential business to close. *Id.*

Similarly, on March 24, 2020, Governor J. Kevin Stitt of Oklahoma declared a state of emergency for Oklahoma and ordered all non-critical businesses to close. Compl. ¶ 33. The following day, on March 25, Governor Jared Polis of Colorado ordered all non-critical businesses to close. Compl. ¶ 34. Governor Polis has ordered non-critical businesses to remain closed until April 26, 2020. *Id.*

COVID-19 has taken a devastating toll on the country. As of April 13, 2020, this insidious and pernicious virus has infected 557,663 Americans and killed 22,116 Americans.[11] But COVID-

---

[11] *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering*, Johns Hopkins University & Medicine (last visited Apr. 11, 2020), https://coronavirus.jhu.edu/map.html.

19 is not only ravaging the health of Americans, but it is also ravaging this Nation's economy. By Tuesday, April 7, 2020, 42 states and the District of Columbia had issued stay-at-home orders, meaning that approximately 316 million Americans have been ordered to stay at home and not go to work.[12] This has resulted in more than a 5,000-point drop in the Dow Jones Industrial Average between January 22 and April 9, 2020, and a dramatic increase in unemployment, with approximately 17 million initial unemployment claims filed in the three weeks between March 19 and April 9, 2020. Compl. ¶¶ 36-39.[13]

On March 27, 2020, to provide a much-needed jolt to the American economy, which had been ravaged by COVID-19, President Trump and Congress collaborated to enact the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020). The purpose of the CARES Act was "to provide immediate assistance to individuals, families, and businesses affected by the COVID-19 emergency." SBA Business Loan Program Temporary Changes; Paycheck Protection Program at 4 (Interim Final Rule Apr. 2, 2020) (to be codified at 13 C.F.R. pt. 120) (attached hereto as Ex. A). Congress vested the SBA with authority "to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency." *Id.* at 3.

Included in the CARES Act is the new Paycheck Protection Program ("PPP"). CARES Act, Pub. L. No. 116-136, §1102(a), 134 Stat. 281 (2020) (to be codified at 15 U.S.C. § 636(a)(36)). Congress established the PPP to provide economic relief to small businesses

---

[12] Sarah Mervosh, Denise Lu, and Vanessa Swales, *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (last updated April 7, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[13] *See* Jim Zarroli and Avie Schneider, *Jobs Carnage Mounts: 17 Million File For Unemployment In 3 Weeks*, National Public Radio (April 9, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/09/830216099/6-6-million-more-file-for-unemployment-as-coronavirus-keeps-economy-shut.

nationwide adversely impacted by COVID-19. *See* Ex. A at 3-4. The SBA stated that due to the various health emergencies declared across the Nation, including the stay-at-home orders by state governments, "small businesses nationwide are experiencing economic hardship." *Id.* at 2. The various measures, including safe distance mandates, are decreasing economic activity for a host of businesses. *Id.* at 3. In the CARES Act, Congress appropriated $349 billion to the SBA to "guarantee loans under the PPP through June 30, 2020." *Id.* at 5. Congress's intent "is that SBA provide relief to America's small businesses expeditiously." *Id.* at 5. Small businesses are allowed to borrow up to $10 million unless the business, using a payroll-based formula, arrives at a lower number. *Id.* at 8-9. Importantly, the SBA guarantees 100 percent of the loans provided through the PPP, and some recipients eligible to apply for forgiveness may potentially receive loan forgiveness. *Id.* at 3.

SBA Loan recipients can use loans through the PPP to help pay the following costs:

a. Payroll costs;
b. Costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;
c. Employee salaries, commissions, or similar compensations;
d. Payments of interest on any mortgage obligation (which shall not include any prepayment of or payment of principal on a mortgage obligation;
e. Rent (including rent under a lease agreement);
f. Utilities; and
g. Interest on any other debt obligations that were incurred before the covered period.

CARES Act, Pub. L. No. 116-136, §1102(a)(2)(F)(i), 134 Stat. 281 (2020).

The CARES Act proclaims that "in addition to small business concerns, *any business concern*, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan." *Id.* at § 1102(a)(2)(D)(i) (emphasis added). However, not all entities are eligible to participate in the PPP. The CARES Act sets forth a number of eligibility requirements that businesses must meet in order to be eligible for PPP. *See*

Ex. A at 5-7. Importantly, small businesses that are identified in existing SBA regulations as being ineligible for SBA business loans are ineligible for PPP. *Id.* at 8. These ineligible businesses include, *inter alia*, "[n]on-profit businesses," "[b]usinesses principally engaged in teaching, instructing, counseling, or indoctrinating religion or religious beliefs, whether in a religious or secular setting," and "[b]usinesses primarily engaged in political or lobbying activities." 13 C.F.R. §§ 120.110(a), (k), and (r).

As a result of the CARES Act, however, some of these entities are now permitted to participate in the PPP. Congress, through the CARES Act, overturned the SBA's prohibition on non-profits receiving loans. *See Id.* at § 120.110(a). Under the CARES Act, 501(c)(3)'s, veterans groups, and Tribal businesses are eligible to receive loans. Ex. A at 6. Additionally, on Friday, April 3, 2020, the SBA issued additional guidance concerning its prohibition on allowing loans to churches. SBA, Business Loan Program Temporary Changes, Paycheck Protection Program (Interim Final Rule Apr. 3, 2020) (to be codified at 13 C.F.R. pt. 121) (attached hereto as Ex. B). Exercising its authority "to modify existing loan programs and establish a new loan program," the SBA exempted church organizations from the SBA's affiliation rules that would otherwise make some churches too large to qualify for the loan or otherwise be prohibited from receiving loans. *Id.* at 3, 6-7, and 9. This exemption was necessitated under the Religious Freedom Restoration Act. *Id.* at 6. Furthermore, the Administrator determined that the SBA did "not have a compelling interest in denying emergency assistance to faith-based organizations that are facing the same economic hardship to which the CARES Act responded and who would be eligible for PPP but for their faith-based organizational and associational decisions." *Id.* at 8. Accordingly, the Administrator has determined "to exempt from application of SBA's affiliation rules faith-based

organizations that would otherwise be disqualified from participation in PPP because of affiliations that are a part of their religious exercise." *Id.* at 10.

Although many of the other entities classified under 13 C.F.R. § 120.110 may participate in PPP, Plaintiffs and those similarly situated to them are still prohibited from doing so due to the SBA's existing prohibition on giving loans to entities whose "[b]usinesses [are] primarily engaged in political or lobbying activities." 13 C.F.R. § 120.110(r).

Plaintiffs are not immune from the economic turmoil that COVID-19 has inflicted on the Nation's economy. *See generally* Ridder Aff.; Robinson Aff. Like other small businesses that are coping with the economic impact of COVID-19, Plaintiffs are in dire need of an infusion of cash. In fact, given the nature of their work, Plaintiffs are acutely suffering the economic impacts of COVID-19. *Id.* They are otherwise eligible for loans through the PPP, but the SBA prohibits Plaintiffs from obtaining this necessary cash infusion because Plaintiffs exercise their fundamental constitutional rights. *Id.* Plaintiffs would gladly apply for loans under the PPP but for the SBA's Political Speech Prohibition codified at 13 C.F.R. § 120.110(r). If Plaintiffs are unable to obtain this loan, Plaintiffs will be forced to abstain or substantially limit the exercise of their constitutional right to petition government and to enable and assist others in exercising the fundamental rights to run for public office and advance ballot initiatives and referendums. *Id.* Not only is this a significant injury to Plaintiffs, but it is an injury to society as a whole as speakers will be compelled to exit the marketplace of ideas. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The SBA's Political Speech Prohibition, especially now during an economic crisis the likes of which this country has not seen since the Great Depression, deprives Plaintiffs of the most effective way to petition government and exercise their free speech rights in an election year, namely through

engaging in speech on behalf of their clients. *See Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014).

## STANDARD OF REVIEW

A party seeking a preliminary injunction must make a "'clear showing' that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Pursuing America's Greatness v. FEC (PAG)*, 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting *Winter v. NRDC*, 555 U.S. 7, 20, 22 (2008)). The last two factors, balance of the equities and public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also PAG*, 831 F.3d at 511.

"The burdens at the preliminary injunction stage track the burdens at trial." *PAG*, 831 F.3d at 510 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). The SBA's regulation is subject to the highest level of review, strict scrutiny, because it "burden[s] political speech." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Accordingly, it is the government's burden here to prove that the SBA's Political Speech Prohibition, restricting businesses that primarily engage in political and lobbying activity from receiving loans under the PPP, satisfies strict scrutiny. *PAG*, 831 F.3d at 510. If a less restrictive alternative exists for achieving the government's compelling interest, it must use that alternative. *Id.*

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

Plaintiffs bring three challenges to the SBA's Political Speech Prohibition, which prevents Plaintiffs' businesses from receiving assistance under the PPP because such businesses primarily engage in political and lobbying activity. Accordingly, Plaintiffs challenge the PPP's Political

Speech Prohibition, codified at 13 C.F.R. § 120.110(r), as amended by SBA's Interim Rules (Exs. A & B hereto), as applied to Plaintiffs' businesses.

*First*, the SBA's Political Speech Prohibition violates the unconstitutional conditions doctrine because it compels Plaintiffs to forego their fundamental constitutional rights to obtain a loan. The SBA is not subsidizing lobbying and political activity; it is providing small business loans with one percent interest rates. But its rule is controlling Plaintiffs' political activity, effectively prohibiting that activity in exchange for a loan.

*Second*, the SBA's Political Speech Prohibition is a content-based speech ban that cannot survive strict scrutiny. While this Nation is ravaged by the global pandemic that is COVID-19, this Nation needs fully-informed decision-making to combat it, and there is no basis for restricting fundamental rights such as running for office, promoting ballot measures, or petitioning the government about policy and legislation. There is no conceivable governmental interest, let alone a compelling one, in forcing lobbying and political consulting firms to go out of business while sparing others that were otherwise ineligible under the pre-existing SBA regulations.

*Third*, the SBA's Political Speech Prohibition violates the equal protection principles contained in the Fifth Amendment. The SBA's Political Speech Prohibition treats lobbying and political businesses differently when they are in fact similarly situated to other small businesses. Furthermore, the classification for lobbying and political activity is one that turns on the Plaintiffs' exercise of their fundamental constitutional rights and content of their speech. Thus, the SBA must satisfy strict scrutiny. This the SBA cannot do.

### A. **The SBA's Political Speech Prohibition Violates The First Amendment Because It Constitutes An Unconstitutional Condition.**

The First Amendment declares, in no uncertain terms, that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to

petition the Government for a redress of grievances." U.S. Const. amend. I; *see also Citizens United v. FEC*, 558 U.S. 310, 340-41 (2010). Although Congress has the broad authority to appropriate funds as it sees fit, including the imposition of limits on how those funds are used, "the First Amendment supplies a limit on Congress's ability to place conditions on the receipt of funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 213-14 (2013) (internal quotations omitted). Accordingly, "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit." *Id.* at 214 (internal quotations omitted) (alteration in the original).

The Supreme Court has set out the basis for distinguishing between those constitutionally permissible conditions that define the limits of a program and those impermissible conditions that infringe upon an individual's constitutional rights. *See id.* at 214. In cases where the Supreme Court has upheld conditions as merely demarcating the limits of a program, the Court has highlighted factors demonstrating that this is a limitation and not an unconstitutional condition. For example, in *Regan v. Taxation With Representation*, 461 U.S. 540, 544-45 (1983), in finding that Congress did not violate the Constitution by refusing to extend tax-exempt status under section 501(c)(3) of the Internal Revenue Code to organizations that lobby, the Court noted that Congress did not compel these lobbying organizations to do anything or prohibit them from lobbying. *See also Agency for Int'l Dev*., 570 U.S. at 215. This is because the plaintiff lobbying organizations could establish a dual corporate structure where the plaintiff could receive tax-deductible contributions for its non-lobbying activities and create a separate entity (exempt under section 501(c)(4) of the Internal Revenue Code) for its lobbying activity. *Taxation With Representation*, 461 U.S. at 544. Accordingly, Congress's decision not to grant tax-exempt status under

501(c)(3)—in effect a subsidy—to organizations that conduct substantial lobbying activities was permissible under the Constitution. *Id.*

Similarly, in *United States v. Am. Library Ass'n*, 539 U.S. 194, 199 (2003), Congress prohibited public libraries from receiving funds for internet access on public library computers, unless the library installed filtering software to prevent children from viewing pornography. In response to the libraries' claim that this limitation violated their First Amendment rights, the Court ruled that the statute did not penalize libraries "that choose not to install such software, or deny them the right to provide their patrons with unfiltered Internet access." *Id.* at 212. The statute merely reflected Congress's decision not to subsidize libraries who chose to provide their patrons unfiltered Internet access. *Id.* The statute still left libraries free to offer unfiltered Internet access. *Id.*

By contrast, when Congress enacts a statute where the grant of funds compels the recipient to act a certain way or prohibits them from acting a certain way, then Congress violates the Constitution. For example, in *FCC v. League of Women Voters*, 468 U.S. 364 (1984), plaintiffs challenged a portion of the Public Broadcasting Act alleging it violated the First Amendment to the U.S. Constitution. There, the challenged statute prohibited "any noncommercial educational broadcasting station which receives a grant from the Corporation to engage in editorializing." *Id.* at 366 (internal quotations omitted). In its constitutional analysis, the Court began noting that the statute was "specifically directed at a form of speech — namely, the expression of editorial opinion … on 'controversial issues of public importance.'" *Id.* at 381. The Court described this prohibition as content-based, *id.* at 383-84, and stated that the "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *Id.* at 381 (internal quotations

omitted). The government could not justify this content-based speech regulation under a heightened scrutiny. *Id.* at 386-99.[14]

But then the Court turned to the Government's argument that its content-based speech ban was justified under the Spending Clause. *Id.* at 399. Attempting to couch its arguments within the friendly confines of *Taxation With Representation*, the Government asserted that Congress was merely choosing not to subsidize editorial speech. *Id.* The Court rejected this argument, distinguishing *Taxation With Representation* on the grounds that the plaintiffs in that case (nonprofit groups engaged in lobbying) could establish separate corporate entities to conduct their lobbying activity. *Id.* at 399-400. Under the law challenged in *League of Women Voters*, however, "a noncommercial educational station that receives only 1% of its overall income from CPB grants is barred absolutely from all editorializing." *Id.* at 400. Accordingly, Congress prohibited noncommercial broadcasters that received funds from ever editorializing, even if the broadcaster used segregated funds instead of taxpayer funds. *Id.* ("The station has no way of limiting the use of its federal funds to all noneditorializing activities, and, more importantly, it is barred from using even wholly private funds to finance its editorial activity."). Accordingly, the Court declared the editorializing prohibition statute unconstitutional. *Id.* at 402; *see also Rust v. Sullivan*, 500 U.S. 173, 178-79, 196-97 (1991) (upholding Health and Human Services regulation limiting "the ability of Title X fund recipients to engage in abortion-related activities" because the regulation allowed the Title X *grantee* to continue advocating for abortion while prohibiting the grantee from

---

[14] The heightened scrutiny applied by the Court in *League of Women Voters* is unique to broadcasters who are denied "the absolute freedom to advocate one's own positions without also presenting opposing viewpoints." 468 U.S. at 380. Nevertheless, such heightened scrutiny is similar to the more familiar strict scrutiny, and the *League of Women Voters* Court acknowledged a restriction on broadcasters would only survive where "the restriction is narrowly tailored to further a substantial governmental interest." *Id.*

advocating for abortion with funds given for a Title X project, stating that "our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." (emphasis in original)).

In *Agency for Int'l Dev.*, Congress mandated that "no funds may be used by an organization 'that does not have a policy explicitly opposing prostitution and sex trafficking.'" 570 U.S. at 208. The Court declared that this imposed an unconstitutional condition because the Government required "that funding recipients adopt—as their own—the Government's view on an issue of public concern" without permitting the recipient to use their own funds to express their own views. *Id.* at 218. In so doing, Congress placed a condition on the recipient of the funds, not the project. *Id.* at 218-19. Congress's statute exceeded preventing recipients from using funds that undermined Congress's policy and instead compelled recipients "to pledge allegiance to the Government's policy of eradicating prostitution." *Id.* at 220. Accordingly, the Court ruled that this was an unconstitutional condition. *Id.* at 220-21.

Here, the SBA regulation denying PPP loans to firms engaged in political or lobbying activity clearly falls in the category of an unconstitutional Political Speech Prohibition that is unquestionably a condition. This condition is one that infringes Plaintiffs' constitutional rights rather than one that merely defines the limits of the PPP.

*First*, the PPP is not a subsidy—it is a loan. Congress, through the SBA, is appropriating funds for small business *loans*. To make this point clear, in the SBA's 31-page PPP interim rule the word "loan" or "loans" appears 169 times. *See* Ex. A. The Cambridge Dictionary Online defines the term "loan" as: "an amount of money that is borrowed, often from a bank, and has to

be paid back, usually together with an extra amount of money that you have to pay as a charge for borrowing." *Loan*, Cambridge Dictionary Online (last visited Apr. 12, 2020), https://dictionary.cambridge.org/us/dictionary/english/loan. Accordingly, the PPP is not a subsidy. *See Autor v. Pritzker*, 740 F.3d 176, 183-84 (D.C. Cir. 2014) (noting that the Supreme Court has never extended its subsidy doctrine beyond cases involving financial benefit, that the advisory board at issue there did not compensate members of the board and made members pay out-of-pocket expenses, and declining to extend the subsidy doctrine beyond the mores of conferring a financial benefit); *see also* Ex. A at 4 (describing the PPP as a new loan program that may qualify for forgiveness).

Furthermore, these loans have an interest rate of one percent, requiring a borrower of $1,000,000 to repay the government the $1,000,000, as well as an additional $10,000 in interest. Ex. A at 11. And, although portions of the PPP loans are forgivable, the SBA has not issued additional guidance on loan forgiveness. *Id.* at 14. As of right now, however, only 25%of the forgiveness amount can be attributable to non-payroll costs while payments to independent contractors are not forgivable. *Id.* at 14-15. Accordingly, because these are loans and not subsidies, granting loans to Plaintiffs' businesses that are primarily engaged in First Amendment protected activities does not constitute the government subsidizing these activities. *Compare Taxation With Representation,* 461 U.S. at 544 (stating that granting tax-exempt status under 501(c)(3) has the effect of a cash *grant*—money that is not paid back—to an organization), *with* the PPP (granting a *loan*—money that is paid back—with a one percent interest rate), *and Autor*, 740 F.3d at 183 (finding that plaintiffs stated a claim under the unconstitutional conditions doctrine because the White House prohibited lobbyists from sitting on an advisory board that, while it conferred policy-making benefits, was voluntary and required members to pay their own out-of-pocket expenses).

*Second*, the SBA's Political Speech Prohibition controls the activities of Plaintiffs and not just a program. Just as organizations applying for grants in *Agency for Int'l Dev.*, 570 U.S. at 208, had to adopt an entity wide "policy explicitly opposing prostitution and sex trafficking," so too here, to receive a loan *of any amount*, your business cannot be primarily engaged in lobbying or political activity *even if it uses none of the loan proceeds* specifically to engage in such activity. *Compare Agency for Int'l Dev.*, 570 U.S. at 217-20 (declaring unconstitutional a grant program that required recipients to explicitly oppose prostitution and sex trafficking), *with Rust*, 500 U.S. at 196-98 (upholding Title X grant program that prohibited program funds from being used to promote abortion but allowed the grantee to use other funds to promote abortion). The SBA's Political Speech Prohibition controls Plaintiffs' behavior, requiring Plaintiffs to forego lobbying and political activity altogether to obtain a loan. *Agency for Int'l Dev.*, 570 U.S. at 218 ("A recipient cannot avow the belief dictated by the Policy Requirement when spending Leadership Act funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime."). SBA's Political Speech Prohibition goes beyond controlling what the money can be used for and instead controls what the recipient can do. *Id.* ("By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient."); *see also League of Women Voters*, 468 U.S. at 399-401. Accordingly, 13 C.F.R. § 120.110(r) constitutes an unconstitutional condition.

Far from permitting a library to provide unfiltered internet service without government money, the current economic malaise caused by the COVID-19 global pandemic means that Plaintiffs' small businesses are subject to significant financial hardship. *See, e.g.,* Ridder Aff. ¶¶ 9-10, 16-18; Robinson Aff. ¶¶ 9, 15-17. Plaintiffs' small businesses, unlike the plaintiffs in

*Taxation With Representation*, do not have the option of establishing another corporate entity. This is so because that separate entity would not have been in business on February 15, 2020—a condition for participation in the PPP—and because Plaintiffs' businesses, regardless of structure, primarily engage in lobbying and political activity to carry out their business. In this COVID-19 caused economic disaster, Plaintiffs cannot simply forego a PPP loan and be free to continue engaging in First Amendment activities. *Cf. Am. Library Ass'n*, 539 U.S. at 212 (stating that libraries were not penalized for not installing internet filters on their computers and were free to provide unfiltered internet access). Instead, in the current economic malaise, Plaintiffs do not have the luxury that the public libraries had: either Plaintiffs receive PPP loans, or they forego their constitutional rights of free speech in the height of campaigns and the right to engage in speech. Ridder Aff. ¶¶ 10-12, 16-19; Robinson Aff. ¶¶ 9-11, 15-18; *see Autor*, 740 F.3d at 183 (finding plaintiffs "pled a viable First Amendment unconstitutional conditions claims" by plausibly alleging "that the government has conditioned their eligibility for the valuable benefit of [an advisory board] membership on their willingness to limit their First Amendment right to petition government."). Indeed, Plaintiffs are not insulated from the financial turmoil that COVID-19 has inflicted on the economy, but rather are acutely suffering its economic impacts due to the nature of their work. Accordingly, the SBA's Political Speech Prohibition infringes Plaintiffs' constitutional rights. *Autor*, 740 F.3d at 182 (lobbying, including lobbying for compensation, is a protected constitutional right); *Citizens United*, 558 U.S. at 339-340 ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." (internal quotations omitted)).

The PPP is not a subsidy, but a loan. Accordingly, the Supreme Court's government subsidy jurisprudence is inapplicable. Furthermore, SBA's Political Speech Prohibition constitutes

a control on Plaintiffs' exercise of their constitutional rights and not merely on the program itself. *See Agency for Int'l Dev.*, 570 U.S. at 217-20; *League of Women Voters*, 468 U.S. at 399-401; *cf. Rust*, 500 U.S. at 196-97. The SBA's Political Speech Prohibition does not provide for alternative structures to permit Plaintiffs' businesses to obtain loans for some parts of their work because Plaintiffs are primarily engaged in political and lobbying activity. Thus, Plaintiffs are ineligible to receive loans to pay their employees, accountants, computer professionals, and analysts—the non-lobbying and non-political parts of their business. *League of Women Voters*, 468 U.S. at 399-401. Because Plaintiffs are primarily engaged in political and lobbying activity, they are ineligible even for a $1 loan. Finally, in light of the economic disaster imposed upon this Nation by COVID-19, Plaintiffs' inability to receive a loan will cause significant economic hardship, prohibiting them from exercising their constitutional rights to lobby and disseminate messages on the campaign trail and in the public arena. *Autor*, 740 F.3d at 182-84. The SBA's Political Speech Prohibition is therefore unconstitutional as applied to the PPP.

   **B.   The SBA's Political Speech Prohibition Violates The First Amendment Because It Is A Content-Based Speech Ban.**

   "Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Accordingly, content-based speech restrictions are subject to strict-scrutiny and presumptively unconstitutional. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *Pursuing America's Greatness v. FEC (PAG)*, 831 F.3d 500, 510 (D.C. Cir. 2016). A regulation is content-based if it requires "enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (internal quotations omitted). Stated differently, "[g]overnment regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message

expressed." *Reed*, 135 S. Ct. at 2227. This Court must therefore consider whether the SBA's ineligibility regulation draws distinctions on its face based on the message the speaker conveys. *Id.* Examples include those statutes that define speech that is permitted and speech that is prohibited based upon the speech's subject matter, function, or purpose. *Id.*

A statute is content-based—and subject to strict scrutiny—even if the statute does not take a position on the subject. *Id.* at 2228, 2230 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech," and "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." (internal quotations omitted)). Laws that restrict only political speech are still content-based and unconstitutional even if the statute "imposed no limits on the political viewpoints that could be expressed." *Id.* at 2230.

If the regulation makes distinctions based upon the subject-matter of speech, then the regulation is subject to strict scrutiny. *Id.* at 2228, 2231 ("[A] speech regulation is content based if the law applies to particular speech because of the topic discussed"). The First Amendment is not concerned with the motives behind content-based speech restrictions because "[t]he vice of content-based legislation . . . is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes." *Id.* at 2229. Accordingly, the First Amendment rejects the argument that "discriminatory . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas." *Id.*

In *Reed*, 135 S. Ct. at 2224, the Town of Gilbert prohibited the placing of signs within town limits without a permit. The Sign Code then exempted twenty-three different categories of signs from the permit requirement, but placed certain restrictions on them. *Id.* At issue in *Reed* were

three categories of exempt signs: Ideological Signs, Political Signs, and Temporary Directional Signs Relating to a Qualifying Event. *Id.* at 2224-25. The Sign Code treated ideological signs most favorably, allowing them to be larger, placed in more areas, and with no time limit on their posting. *Id.* at 2224. Political signs were designed to influence an election, and treated less favorably than ideological signs. *Id.* Although political signs were permitted to be larger than other signs (including ideological signs if placed on nonresidential property), these signs could not be placed earlier than sixty days before a primary election and had to be removed no later than 15 days following the general election. *Id.* at 2224-25. Finally, temporary directional signs relating to a qualifying event were signs that directed persons to an assembly, or religious, or charitable meeting, and treated even less favorably. *Id.* at 2225. Importantly, the Town prohibited more than four signs at one time on private property. *Id.* Additionally, these signs were permitted to be placed no earlier than twelve hours before the event and had to be removed no later than one hour after the event. *Id.*

The Supreme Court declared the Town of Gilbert Sign Code unconstitutional. The Court held that even though the Sign Code did not target viewpoints, the Sign Code still singled out specific categories of subject matter of speech for differential treatment. *Id.* at 2230. Ideological messages were treated more favorably than messages from political candidates, and political candidates were treated better than those signs announcing assemblies of like-minded individuals. *Id.* Accordingly, the Sign Code could withstand scrutiny only if the government had a compelling interest and used means that were narrowly tailored. *Id.* at 2232. The Town of Gilbert could not demonstrate such an interest and the Supreme Court declared the statute unconstitutional. *Id.*

The Supreme Court has reviewed government grant criteria through the lens of its content-based speech jurisprudence. In *League of Women Voters*, a group of plaintiffs challenged a statute

that prohibited "any noncommercial educational broadcasting station which receives a grant from the Corporation to engage in editorializing." 468 U.S. 364, 366 (1984). In its constitutional analysis, the Court began noting that the statute was specifically directed at a form of speech, namely, editorial opinion on "controversial issues of public importance." *Id*. at 381. The Court described this prohibition as content-based, *id*. at 383-84, and stated that the "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *Id*. at 381 (internal quotation marks omitted). The Court ruled that the statute was content-based because to determine if a "particular statement by station management constitutes an "editorial" proscribed by [the statute], enforcement authorities must necessarily examine the content of the message that is conveyed . . ." *Id*. at 383. Because the "First Amendment's hostility to content-based regulation extends . . . to prohibition of public discussion of an entire topic" the Court stated it must closely and cautiously review the statute. *Id*. at 383. The government was required to prove that its statute was narrowly tailored to achieve a substantial governmental interest. *Id*. at 380.

The Government asserted two interests. First, to protect certain broadcasters from governmental coercion through federal financing and potentially used as vehicles for government propaganda. *Id*. 384-85. Next, the Government asserted that it did not want private interest groups capturing the stations to express their viewpoints. *Id*. at 385. The Court rejected both interests, holding that they were not substantial and that the statute was both underinclusive and overinclusive. *Id*. at 385-399. Importantly, even assuming the interests asserted were substantial, the statute was not narrowly tailored because the broad ban on editorializing did not address the Government's stated goals. *Id*. at 400.

The SBA has encountered the Supreme Court's First Amendment content-based jurisprudence previously. In 1983, plaintiffs brought a First Amendment challenge to an SBA

regulation known as the "opinion molder rule." *Mission Trace Invs., Ltd. v. SBA*, 622 F. Supp. 687, 688-89 (D. Colo. 1985), *rev'd on other grounds sub. nom. Ascot Dinner Theatre, Ltd. v. SBA*, 887 F.2d 1024 (10th Cir. 1989). Similar to the SBA's current Political Speech Prohibition, the opinion molder rule stated the following:

> Financial assistance will not be granted by SBA … if the applicant is engaged in the creation, origination, expression, dissemination, propagation, or distribution of ideas, values, thoughts, opinions or similar intellectual property, regardless of medium, form or content. Financial assistance to such applicants is barred in order to avoid Government interference, or the appearance thereof, with the constitutionally protected freedoms of speech and press.

*Id.* at 689 (quoting 13 C.F.R. § 120.2(d)(4) (1985)).[15]

The District Court for the District of Colorado first concluded that "the opinion molder rule completely deprives otherwise qualified applicants of *all* their potential SBA benefits solely because they engage in constitutionally protected activity," then turned to analyze whether the opinion molder rule was an unconstitutional content-based speech prohibition. *Id.* at 696. The court determined that the opinion molder rule constituted a content-based speech ban. *Id.* at 697 ("[T]he opinion molder rule discriminates against expression because of the content of that expression."). Accordingly, the opinion molder rule constituted a content-based speech ban even though it banned an entire topic of speech. *Id.* at 698 ("[A] statute that inhibits all the viewpoints of a heterogeneous group of speakers in an important forum of public communication violates the First Amendment."). Furthermore, to enforce the opinion molder rule "requires the SBA to examine the content of a loan applicant's speech." *Id.* at 697. Noting that the SBA's opinion molder rule permits commercial advertising, the court ruled that the First Amendment does not permit favoritism

---

[15] *See Student Government Asso. v. Board of Trustees*, 868 F.2d 473, 481 and n.8 (1st Cir. 1989) (describing *Mission Trace Investments, Ltd. v. Small Business Administration*, 622 F. Supp. 687 (D. Colo. 1985) as a case involving a "direct penalty on speech.")).

between commercial speech and speech that promotes ideas. *Id.* at 699. The court ruled that "the opinion molder rule inhibits important media of public expression because of the content or viewpoints of the messages expressed." *Id.* at 700.

Finally, after balancing the interests under constitutional scrutiny, the court held that the opinion molder rule violated the First Amendment. *Id.* at 702. The court ruled that "[a]n agency established to promote economic well-being by assisting viable small businesses *may not deny benefits to applicants solely because they engage in constitutionally protected expression.*" *Id.* (emphasis added). The SBA did not challenge this holding on appeal and the Tenth Circuit did not review it. *See Ascot Dinner Theatre, Ltd. v. SBA*, 887 F.2d 1024, 1026 (10th Cir. 1989).

Here, Congress has vested the SBA with $349 billion to "guarantee loans under the PPP through June 30, 2020." Ex. A at 5. Congress's intent with this program "is that SBA provide relief to America's small businesses expeditiously." *Id.* Recognizing the enormity of the economic disaster COVID-19 has imposed on the United States' economy, Congress declared that these loans are eligible for "*any business concern.*" CARES Act, Pub. L. No. 116-136, §1102(a)(2)(D)(i), 134 Stat. 281 (2020) (emphasis added).

But, similar to the opinion molder rule, the SBA has declared that its loans, including loans through the PPP, are not available for "[b]usinesses [that are] primarily engaged in political or lobbying activities." 13 C.F.R. § 120.110(r); Ex. A at 8. This constitutes a content-based speech prohibition that is presumptively unconstitutional. *Reed*, 135 S. Ct. at 2226-27; *League of Women Voters*, 468 U.S. at 389-99 (holding that a government funding program that prohibited grantees from editorializing about public policy issues constituted a content-based speech ban, and was "not narrowly tailored to address any of the Government's suggested goals."); *Mission Trace Invs., Ltd.*, 622 F. Supp. at 702 (declaring unconstitutional as a content-based speech ban the SBA's

opinion molder rule which denied SBA loans to organizations that promoted ideas); *see also United States v. Playboy Entm't Group*, 529 U.S. 803, 818 (2000) ("It is rare that a regulation restricting speech because of its content will ever be permissible.").

*First*, the SBA's Political Speech Prohibition constitutes a facially content-based statute because it makes facial distinctions concerning a particular subject matter, political speech and lobbying. *See Reed*, 135 S. Ct. at 2228, 2230. Furthermore, the SBA's Political Speech Prohibition constitutes a content-based speech ban because to enforce it, the SBA must look to the content of Plaintiffs' speech, here, political and lobbying speech. *League of Women Voters*, 468 U.S. at 383-84 (noting that to enforce a statute that prohibited government grant recipients from editorializing about public policy issues "enforcement authorities must necessarily examine the content of the message that is conveyed to determine whether the views expressed concern 'controversial issues of public importance.'"); *Mission Trace Invs., Ltd.*, 622 F. Supp. at 697; *cf. McCullen*, 573 U.S. at 479.

Both political campaign speech and lobbying speech are protected under the First Amendment. *Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014); *see also Citizens United*, 558 U.S. at 339-340 ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." (internal quotations omitted)). The First Amendment is especially important now in the middle of this global pandemic because speech is essential to enlightened self-government and deliberation concerning the pressing issues that face this great Nation in this time of peril. *See Citizens United*, 558 U.S. at 339. Absent a loan through the PPP, society will lose voices in the marketplace of ideas. Ridder Aff. ¶¶ 9-10; Robinson Aff. ¶¶ 8-9; *see also Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

*Second*, it is irrelevant that the SBA prohibits lobbying and political consulting firms from receiving loans, regardless of their political persuasion. *See Reed*, 135 S. Ct. at 2228, 2230. The SBA still prohibits a group of businesses from receiving much-needed loans due to the subject-matter of those businesses' speech. *See id.* at 2230 ("The Town's Sign Code singles out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter. . . . That is a paradigmatic example of content-based discrimination.").

*Third*, because the SBA's Political Speech Prohibition is a content-based speech prohibition, it is irrelevant that Plaintiffs can still speak. Because Political Speech Prohibition imposes a burden—here, in the midst of an economic crisis caused by a global pandemic, a substantial burden—SBA must still satisfy strict scrutiny. *Playboy Entm't Group*, 529 U.S. at 812 (2000) ("The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."); *PAG*, 831 F.3d at 510 ("[W]hether a burden on speech leaves open alternative means of expression does not factor into whether a speech ban is content based.").

To satisfy strict scrutiny, the SBA "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994); *see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011). It is the SBA's burden to prove it has a compelling interest and its prohibition is the most narrowly tailored means to achieve that interest. *Playboy Entm't Group*, 529 U.S. at 816-17. The SBA cannot satisfy strict scrutiny when the legislative and regulatory record for the Political Speech Prohibition is barren. *See Id.* at 822; *PAG*, 831 F.3d at 511 (granting preliminary injunction because the FEC could not "present more than anecdote and supposition to support [its] regulation subject to strict scrutiny." (internal quotations omitted)). The SBA is also prohibited from adducing a *post hoc* justification to satisfy the compelling interest requirement.

*United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

Furthermore, the SBA cannot satisfy the narrow tailoring requirement when PPP loans to lobbyists and political consultants are totally *prohibited*. *Playboy Entm't Group*, 529 U.S. at 815 ("[T]argeted blocking [of speech] is less restrictive than banning, and the Government cannot ban speech if targeted blocking is a feasible and effective means of furthering its compelling interests. … [I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it."); *PAG*, 831 F.3d at 510 ("[T]he Supreme Court regularly views … disclosure requirements as less restrictive alternatives to flat bans on speech."). Accordingly, the SBA's Political Speech Prohibition is unconstitutional as applied to the PPP.

**C.** **The SBA's Political Speech Prohibition Violates The Equal Protection Principles Contained In The Due Process Clause Of The Fifth Amendment.**

The Due Process Clause of the Fifth Amendment declares that "[n]o person shall be … deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Included within the Due Process Clause is the principle of equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The Fifth Amendment's Due Process Clause and its equal protection principle are applicable against federal government action. *See id.* at 500; *Ali Hamza Ahmad Suliman Al Bahlul v. United States*, 767 F.3d 1, 75 (D.C. Cir. 2014) (acknowledging that the Fifth Amendment includes an equal protection component and applies to federal government action); *Quiban v. Veterans Admin.*, 928 F.2d 1154, 1156 n. 3 (D.C. Cir. 1991) ("The Constitution's equal protection clause is contained in the Fourteenth Amendment, which governs action by the states. The Supreme Court has held, however, that a similar constraint, governing federal action, is implicit in the due process clause of the Fifth Amendment."); *Davis v. FEC*, 501 F. Supp. 2d 22, 33 (D.D.C. 2007) (adjudicating equal protection claim brought under the Fifth

Amendment's Due Process Clause against the Federal Election Commission), *rev'd on other grounds* 554 U.S. 724 (2008). The Supreme Court's approach to equal protection claims brought under the Fifth Amendment "has always been precisely the same" as its approach to equal protections claims brought under the Fourteenth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

To succeed in an equal protection claim, one must prove "the denial of equal treatment resulting from the imposition of [a] barrier, not the ultimate inability to obtain [a] benefit." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *see also Autor v. Pritzker* 740 F.3d 176, 184 (D.C. Cir. 2014) ("Because [Plaintiffs] have plausibly alleged that the ban denies them a benefit available to others on account of their exercise of a fundamental right, we must reverse the district court's dismissal of their equal protection claim as well."). Here the SBA's Political Speech Prohibition draws an unconstitutional distinction between Plaintiffs who exercise their fundamental constitutional rights—and thus are prohibited from receiving the benefit of SBA's PPP—and those who do not exercise their fundamental constitutional rights and are eligible for the SBA's PPP. This violates the equal protection of the laws.

Free speech rights, especially during a political campaign, are fundamental rights. *See, e.g.*, *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Gitlow v. New York*, 268 U.S. 652, 666 (1925); *see also Citizens United v. FEC*, 558 U.S. 310, 339 (2010) ("The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." (internal quotations omitted)). When a statute makes a classification that affects fundamental rights, the statute may survive a constitutional challenge only if the statute is narrowly tailored to serve a compelling interest. *See Socialist Workers Party*, 440 U.S. at 184; *see also City of Ladue v. Gilleo*, 512 U.S. 43, 51 n.9 (1994) ("Like other classifications, regulatory

distinctions among different kinds of speech may fall afoul of the Equal Protection Clause.") Classifications that restrict speech based upon the identity of the speaker or the content of the speaker's speech are subject to strict scrutiny. *See Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 101 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives."); *see also Citizens United*, 558 U.S. at 350.

*First*, small businesses, like Plaintiffs, that are engaged primarily in lobbying or political activities are similarly situated with "*any* [*other*] *business concern*." CARES Act, Pub. L. No. 116-136, §1102(a)(2)(D)(i), 134 Stat. 281 (2020) (emphasis added). Like other small businesses that are coping with the economic impact of COVID-19 that has caused at least ten million people to lose their jobs, Plaintiffs are in dire need of an infusion of cash. Ridder Aff. ¶¶ 9-10; Robinson Aff. ¶¶ 8-9, 15-17. Plaintiffs' small businesses are otherwise eligible for loans through the PPP. Ridder Aff. ¶¶ 19-22; Robinson Aff. ¶¶ 18-21.

Plaintiffs' businesses too have employees and independent contractors who, for their lobbying and political consulting, must receive paychecks. Ridder Aff. ¶¶ 8-9; Robinson Aff. ¶¶ 7-8. In the offices where Plaintiffs conduct their lobbying and political consulting business, Plaintiffs must pay rent, utilities, and mortgages. Ridder Aff. ¶ 17; Robinson Aff. ¶ 16. Lobbying and political consulting work is both legal and legitimate; "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at 339.

The sole difference between Plaintiffs' small businesses and those small businesses that are eligible for loans through the PPP is that Plaintiffs' business involves the exercise of fundamental constitutional rights. Such differential treatment on the basis of exercising fundamental constitutional rights cannot survive strict scrutiny. *See Mosley*, 408 U.S. at 101-02

(holding that Chicago's ordinance prohibiting all picketing except for labor unions violated the Equal Protection Clause because "[f]ar from being tailored to a substantial governmental interest, the discrimination among pickets [was] based on the content of their expression," and it was possible to create a more narrowly tailored statute "dealing evenhandedly with picketing regardless of subject matter."); *Cmty.-Service Broad. of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1122-23 (D.C. Cir. 1978) (*en banc*) (holding that an FCC regulation treating noncommercial and commercial broadcasters differently violated the equal protection principles in the Fifth Amendment because "where, as here, fundamental rights are involved, stricter scrutiny is appropriate."). The SBA's differential treatment of Plaintiffs' cannot survive strict scrutiny.

*Second*, SBA's Political Speech Prohibition creates an unconstitutional classification based on Plaintiffs' fundamental constitutional rights. Congress has vested the SBA with $349 billion to "guarantee loans under the PPP through June 30, 2020." Ex. A at 5. Congress's intent with this program "is that SBA provide relief to America's small businesses expeditiously." *Id.* Recognizing the enormity of the economic disaster COVID-19 has imposed on the United States' economy, Congress declared that these loans are eligible for "*any business concern*." CARES Act, Pub. L. No. 116-136, §1102(a)(2)(D)(i), 134 Stat. 281 (2020) (emphasis added).

But the SBA has declared that its loans, including loans through the PPP, are not eligible for "[b]usinesses [that are] primarily engaged in political or lobbying activities." 13 C.F.R. § 120.110(r); Ex. A at 8. This differential treatment for those businesses that exercise fundamental constitutional rights cannot survive strict scrutiny. Accordingly, the SBA's Political Speech Prohibition is unconstitutional as applied to the PPP.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THIS COURT DENIES THEIR MOTION FOR PRELIMINARY INJUNCTION.

In the absence of a preliminary injunction preventing Defendants from prohibiting Plaintiffs, and those similarly situated, from participating in the CARE Act's PPP, they will undoubtedly suffer irreparable harm. If Plaintiffs are excluded from PPP, they will be punished because of the content of their speech. *See supra* 19-27. Such punishment will violate Plaintiffs' free speech rights under the First Amendment and will also impose an unconstitutional condition on Plaintiffs in violation of the First Amendment. *See supra* 12-19. Further, the PPP is distributed on a "first-come, first-served" basis, and Plaintiffs are in dire need of funds in such a devastating economic environment. *See* Ex. A at 13.

In First Amendment challenges, if likelihood of success on the merits is established, the other preliminary injunction elements follow as a result. "In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." *Pursuing America's Greatness v. FEC (PAG)*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotations omitted); *see also N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor.").

Ordinarily, in order to be considered irreparable, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see also Sierra Club v. United States Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (discussing "irreparable harm" standard).

However, the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The D.C. Circuit applies *Elrod v. Burns* with the understanding that "[t]he Supreme Court has instructed that injunctive relief is not appropriate unless the party seeking it can demonstrate that 'First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought.'" *Wagner v. Taylor*, 836 F.2d 566, 576 n. 76 (D.C. Cir. 1987) (alteration in original) (quoting *Elrod*, 427 U.S. at 373-374); *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (internal quotations omitted)); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed."); *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016) (applying the same irreparable harm standard to challenge brought under both First and Fifth Amendments); *see also N.Y. Progress & Prot. PAC*, 733 F.3d at 486 ("The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and a delay of even a day or two may be intolerable." (internal quotations omitted)).

The Plaintiffs undoubtedly face irreparable harm–actual and not merely theoretical harm– through the abridgement of their Constitutional rights. *See supra* 12-31. Plaintiffs' PPP ineligibility constitutes irreparable harm, plain and simple. *See, e.g.*, *Elrod*, 427 U.S. at 373. Moreover, Plaintiffs are not immune from COVID-19's economic effects and the PPP is currently being administered on a "first-come, first-served" basis. Ex. A at 13. Plaintiffs, like many other businesses, are in dire need of an infusion of funds given the economic fallout from COVID-19

measures. Accordingly, not only are Plaintiffs irreparably harmed each and every day that their constitutional rights are violated, but they are also denied the very real government benefit of PPP. Plaintiffs' exclusion from the PPP in such a challenging time will cause them to suffer irreparable harm such as loss of income, loss of employment, forced layoffs, loss of health insurance for those employees that may need to be laid off, or even cessation of operations. *See* Ridder Aff. ¶¶ 9-10; Robinson Aff. ¶¶ 8-9, 15-17.

### III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION.

The Balance of the equities and public interest strongly favor Plaintiffs. "In evaluating whether a preliminary injunction should issue, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Wash. Metro. Area Transit Auth. v. Local 689, Amalgamated Transit Union*, 113 F. Supp. 3d 121, 129 (D.D.C. 2015) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he Government does not have an interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003) (internal quotations omitted).

Moreover, "securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). "The public interest is supported by protecting the right to speak, both individually and collectively." *Carey v. FEC*, 791 F. Supp.2d 121, 136 (D.D.C. 2011). "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). "To assess speech in a public forum some balancing may be necessary, but '*the thumb of the court should always be on the speech side of the scales.*'" *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 84 (D.D.C. 2012) (emphasis added) (quoting *Lebron v. Wash. Metro. Area Transit Auth.*, 749 F.2d 893, 898 (D.C. Cir. 1984)). "[T]here is the

highest public interest in the due observance of all the constitutional guarantees." *United States v. Raines*, 362 U.S. 17, 27 (1960).

The Plaintiffs seek to exercise their free speech rights, rights to petition government, and to exercise those rights without the government withholding benefits unless and until Plaintiffs abandon their constitutional rights. Absent an injunction, Plaintiffs will suffer an unconstitutional burden and irreparable harm. The SBA has no interest in the enforcement of an unconstitutional regulation. Further, no other individual or entity will suffer any kind of harm by permitting Plaintiffs and those similarly situated to them to participate in the PPP. There can be no public interest in prohibiting certain speakers from participating in the PPP, merely because they are exercising their constitutional rights by participating in the political process or petitioning government. Accordingly, the balance of equities and public interest weigh heavily in favor of Plaintiffs and the issuance of a preliminary injunction.

## CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request this Court to grant their Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,
DATED: April 13, 2020

/s/ Jason Torchinsky
Jason Torchinsky (D.C. Bar No. 976033)
jtorchinsky@hvjt.law
Jonathan Lienhard (D.C. Bar No. 501845)
jlienhard@hvjt.law
Shawn Sheehy (Va Bar No. 82630)*
ssheehy@hvjt.law
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Phone: (540) 341-8808
Fax: (540) 341-8809
*Counsel for Plaintiffs*

*Pro Hac Vice Application Forthcoming*

Joseph E. Sandler (D.C. Bar No. 255919)
sandler@sandlerreiff.com
Sandler, Reiff, Lamb, Rosenstein & Birkenstock PC
1090 Vermont Ave., N.W. Suite 750
Washington, D.C. 20005
Telephone: 202 479 -1111
Fax: 202-479-1115
*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Jason Torchinsky, hereby certify that on April 13, 2020, the foregoing has been filed via the CM/ECF system and by email to Emergency_Judge@dcd.uscourts.gov. By agreement of the parties, this filing was also sent via electronic mail and First Class Certified Mail to the Counsel for the Defendants listed below:

/s/ Jason Torchinsky
Jason Torchinsky

Chris Pilkerton
Eric Benderson
Office of General Counsel
U.S. Small Business Administration
409 3rd St, S.W.
Washington DC 20416
eric.benderson@sba.gov

David Morrell
Deputy Assistant Attorney General
Federal Programs Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530
David.M.Morrell@usdoj.gov

James J. Gilligan
Special Litigation Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel: 202-514-3358
James.Gilligan@usdoj.gov

Timothy J. Shea
United States Attorney
District of Columbia
555 4th St NW,
Washington, DC 20530
202-252-7566

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ——————————————————— )<br>AMERICAN ASSOCIATION OF )<br>POLITICAL CONSULTANTS )<br> )<br>RIDDER/BRADEN, INC. )<br> )<br>              Plaintiffs, )<br> )<br>v. )<br> )<br>UNITED STATES )<br>SMALL BUSINESS ADMINISTRATION, )<br> )<br>-and- )<br> )<br>JOVITA CARRANZA )<br>*In her Official Capacity as* )<br>*Administrator of the* )<br>*U.S. Small Business Administration* )<br> )<br>             Defendant. )<br>——————————————————— ) | Civil Case No. _____ |

## [PROPOSED] ORDER GRANTING PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Based upon the pleadings, motions, and evidence received by the Court, the Court hereby **GRANTS** the emergency motion filed by Plaintiffs seeking a temporary restraining order and preliminary injunction and **ORDERS** as follows:

1.    The Small Business Administration, along with its agents and assigns, is hereby restrained and enjoined from enforcing 13 C.F.R. § 120.110(r) in a way that deprives business concerns or nonprofit organizations of eligibility for the Coronavirus Aid, Relief, and Economic Security Act's ("CARES Act") Paycheck

Protection Program, CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), *et seq.*, due to their political or lobbying activities.

      2.     This Order shall remain in effect through the remainder of these proceedings until such time as the Court enters a subsequent Order dissolving this temporary restraining order and/or awarding preliminary or permanent relief.

Date:_____

_____
United States District Judge