**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:20-cv-00970-RCL |
| UNITED STATES SMALL BUSINESS ADMINISTRATION, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Dated:  April 17, 2020

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ERIC WOMACK
Assistant Director

JAMES J. GILLIGAN
Special Litigation Counsel

Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883
Washington, D.C. 20044

Telephone:  (202) 514-3358
E-mail:      james.gilligan@usdoj.gov

*Counsel for Defendant*

# INTRODUCTION

Plaintiffs' case rests entirely on the notion that the Government is constitutionally obligated to subsidize their speech. They couldn't be more wrong. As the Supreme Court held in *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), and has repeatedly reaffirmed ever since, the Government is not required to remove obstacles in the path of a person's exercise of free speech that are not of the Government's own creation. Therefore, as also held in *Regan*, the First Amendment does not compel the Government to subsidize lobbying, or speech of any other kind, on any topic, that the Government does not wish to promote. These are the principles that control this case, and they require that Plaintiffs' motion for a preliminary injunction be denied.

Plaintiffs are a trade association of political consulting and lobbying firms and one of its members. They challenge the constitutionality of a regulation, issued by defendant Small Business Administration ("SBA") almost 25 years ago, 13 C.F.R. § 120.110(r), providing that businesses primarily engaged in political or lobbying activities (as well as 17 other types of businesses designated under the rule) are ineligible for SBA general business loans. The rule reflects the view, long held among state and federal governments, that government should avoid entanglement with and even the appearance of favoritism in the realms of politics and lobbying. Plaintiffs nevertheless contend that application of this longstanding rule to deny political consulting and lobbying firms access to economic relief under the Paycheck Protection Program ("PPP") of the Coronavirus Aid, Relief, and Economic Security (CARES) Act denies these firms their First Amendment and Equal Protection rights. Plaintiffs seek preliminary injunctive relief prohibiting the SBA from enforcing section 120.110(r) to deny them PPP loans.

Plaintiffs' motion should be denied.  First, none of their constitutional claims is likely to succeed on the merits.  Section 120.110(r) does not violate the doctrine of unconstitutional conditions, because it merely prohibits the use of SBA loans to fund private speech that the Government does not wish to subsidize, while leaving political consulting and lobbying firms entirely free to use their own financial resources to engage in any speech they wish.  Second, section 120.110(r) is not a content-based prohibition of speech.  As the Supreme Court has explained, government does not ban, penalize or otherwise infringe on speech simply by deciding not to fund it, and is entitled to make content-based judgments about the speech it will and will not fund so long (as is the case here) it does not engage in invidious viewpoint discrimination, or attempt to suppress the expression of particular ideas.  Third, section 120.110(r) does not violate principles of Equal Protection.  It is rationally related to the legitimate government interest, endorsed by the Supreme Court, of avoiding entanglements with political or lobbying activities that could give rise to an appearance of political favoritism.

Although the legal deficiency of Plaintiffs' claims alone requires that their request for preliminary relief be denied, as discussed below their conclusory assertions of "financial hardship" are insufficient to make the requisite showing of irreparable harm attributable to the SBA's rule.  Moreover, they have not shown that awarding the relief they seek would be in the public interest.  When it designed the PPP, Congress modified a number of SBA rules and regulations for purposes of the program, but did not see fit to waive or modify SBA's policy concerning political consulting and lobbying firms.  Plaintiffs offer no justification for disregarding that legislative judgment, when the effect would be to deny finite funds to other businesses and individuals whose need for economic assistance in this time of crisis is just as great, if not more so, than Plaintiffs'.

## BACKGROUND

### The Small Business Administration

The declared policy of the Government under the Small Business Act, 15 U.S.C. § 631 *et seq.*, is to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns," in order to preserve the system of free competitive enterprise that is "essential" to the economic well-being and security of the Nation. 15 U.S.C. § 631(a). To promote that important national objective, Congress created the Small Business Administration ("SBA"), under the management of a single Administrator, *id.* § 633(a), (b)(1), who is given "extraordinarily broad powers" under section 7(a) of the Act, 15 U.S.C. § 636(a), to provide a wide variety of technical, managerial, and financial assistance to small-business concerns. *See SBA v. McClellan*, 364 U.S. 446, 447 (1960); *see generally* 15 U.S.C. § 636(a) (describing numerous varieties of general small-business loans the Administrator is "authorized" and "empowered" to make); 13 C.F.R. § 120.1. In the performance of these authorized functions the Administrator is further empowered to "make such rules and regulations as [she] deems necessary to carry out the authority vested in [her]," and in addition to "take any and all actions … [that] [she] determines … are necessary or desirable in making … loans." 15 U.S.C. § 634(b)(6), (7).

Under the terms of the Act, SBA financial assistance to a small business under section 7(a) may take the form of a direct loan, an immediate participation (joint) loan with a lender, or a deferred participation (guaranteed) loan initiated by a lender but a portion of which the SBA will purchase from the lender in the event of a borrower default. 13 C.F.R. § 120.2(a); *see Valley Nat'l Bank v. Abdnor*, 918 F.2d 128, 129 (10th Cir. 1990); *California Pac. Bank v. SBA*, 557 F.2d 218, 219 (9th Cir. 1977). In practice, however, the SBA ordinarily guarantees loans made by private lenders rather than disbursing funds directly to borrowers, *see United States v. Kimbell*

3

*Foods, Inc.*, 440 U.S. 715, 719 (1979), thus "reduc[ing] risk for lenders … mak[ing] it easier for them to access capital," and thereby "mak[ing] it easier for small business to get loans." *See https://www.sba.gov/funding-programs/loans*.

Ordinarily, to qualify for an SBA general business loan an applicant must be an operating business organized for profit that is located in the United States, 13 C.F.R. § 120.100(a)-(c); meet the size standards for a "small" business set forth under the statute and SBA rules (usually stated in terms of number of employees, or average annual receipts), *see* 15 U.S.C. § 632(a)(2); 13 C.F.R. § 120.100(d); 13 C.F.R. Part 121; and demonstrate that the desired credit is not available elsewhere on reasonable terms, 15 U.S.C. § 632(h); 13 C.F.R. §§ 120.100(e), 120.101. In addition, an applicant must meet SBA standards of creditworthiness, *see* 13 C.F.R. § 120.150; for loans over $25,000, meet the lender's collateral requirements for similar non-SBA guaranteed loans, SBA Standard Operating Procedure ("SOP") 50-10-5(K), *Lender & Dev. Co. Loan Programs*, Subp. B, Chap. V, § II(B)(3)(b), at 193 (Exh. 1, hereto); and pay an annual "guaranteed [loan] fee" to the SBA equal to 0.55 percent of the outstanding balance of the SBA's share of the loan, 15 U.S.C. § 636(a)(23).  Holders of 20 percent or more ownership shares in the applicant must personally guarantee the loan.  13 C.F.R. § 120.160(a).

**Ineligible Business Types Under 13 C.F.R. § 120.110**

Pursuant to the broad powers conferred on the Administrator by the Small Business Act to make rules and regulations and take other actions deemed necessary or desirable in making SBA loans to small-business concerns, 15 U.S.C. § 634(b)(6), (7); *see supra* at 3, the SBA over time has determined as a matter of policy that SBA business loans should not be made available to certain types of businesses, such as, for example, non-profit businesses, other lenders, businesses in which the lender owns an equity interest, and businesses that have previously

defaulted on federal or federally assisted loans resulting in a loss to the Government. The types of business concerns deemed ineligible for SBA section 7(a) loans (18 in all) are listed at 13 C.F.R. § 120.110, and include, as relevant here, "[b]usinesses primarily engaged in political or lobbying activities[.]" *Id.* § 120.110(r). Businesses covered by this provision are those that derive over 50 percent of their gross annual revenues from such activities. SOP 50-10-5(K), Subp. B, Chap. II, § III(A)(17) at 116.

The SBA first decided that firms primarily engaged in political activities or lobbying should be deemed ineligible for SBA general business loans almost a quarter century ago, in January 1996, *see* 61 Fed. Reg. 3226-02, 3229-40 (Jan. 31, 1996) (final rule); 60 Fed. Reg. 64356, 64359 (Dec. 15, 1995) (proposed rule). It did so in accordance with its mandate under the Small Business Act to establish general policies that direct its limited financial resources in ways that will best serve the public interest, *see* 15 U.S.C. § 633(d); 60 Fed. Reg. at 64360, and with longstanding U.S. Government policy that "Federal funds [should] not be used for lobbying or political activities because to do so would not be an appropriate or cost-effective use of Federal tax dollars." *See* 51 Fed. Reg. 37580-01, 37589 (Oct. 23, 1986). So far as Defendants are aware, the validity of the SBA's policy concerning firms primarily engaged in political activities or lobbying, as codified in section 120.110(r), has never before been questioned in federal court.

### The Coronavirus Aid, Relief, and Economic Stimulus (CARES) Act

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Stimulus ("CARES") Act, Pub. L. 116-136, 134 Stat. 281, passed by Congress to provide an unprecedented package of emergency economic assistance and other support to help individuals, families, businesses, and health-care providers cope with the enormous economic

and public health crises—unlike any experienced in the lifetime of the Nation—triggered by the worldwide coronavirus (COVID-19) pandemic.  *See* SBA, Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program*, https://www.sba.gov/document/policy-guidance--ppp-interim-final-rule ("PPP Interim Final Rule") (Exh. 2, hereto), at 3, 4; *see also, e.g.*, 166 Cong. Rec. H1732-01, 1820-24 (Mar. 27, 2020); (statements of Reps. Neal, Davis, and Mitchell); 166 Cong. Rec. S2059-01 (Mar. 25, 2020) (statement of Sen. Schumer); 166 Cong. Rec. S1862-02 (Mar. 20, 2020) (statement of Sen. McConnell).  Among the numerous measures taken by the CARES Act to address the COVID-19 crisis, of concern here is the Paycheck Protection Program ("PPP"), CARES Act. § 1102, enacted to extend relief to small businesses experiencing economic hardship as a result of the public-health measures being taken to minimize the public's exposure to the COVID-19 virus.  *See* PPP Interim Final Rule at 1, 3.

Specifically, section 1102(a)(2) of the CARES Act adds a new paragraph (36) to section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36), which provides that "*[e]xcept as otherwise provided in this paragraph*, the [SBA] may guarantee [PPP] covered loans"—not make loans directly, however—"under the same terms, conditions, and processes as a loan made under this subsection," i.e., section 7(a).  15 U.S.C. § 636(a)(36)(B) (emphasis added).  The PPP then sets forth in extensive detail the precise ways in which PPP covered loans differ from other section 7(a) loans.  *Id*. § 636(a)(36)(D)-(R).  Among these differences, the PPP authorizes the SBA to make covered loans to various non-profit organizations, independent contractors, and self-employed individuals, as well as to small business concerns, *id*. § 636(a)(36)(D)(i), (ii); relaxes size limitations to allow businesses with as many as 500 employees (or more, depending on the industry in which they operate) to receive assistance, *id*. § 636(a)(36)(D)(i)(I); and selectively waives certain of the SBA's affiliation rules used to make small business "size"

determinations, *id.* § 636(a)(36)(D)(iv); *see* 13 C.F.R. Part 121.  The PPP also expressly caps the chargeable rate of interest of a covered loan at four percent (SBA has further limited the rate to one percent), *id.* § 636(a)(36)(L); PPP Interim Final Rule at 11; and waives the "no credit elsewhere," personal guarantee, collateral, and guaranteed loan fee requirements imposed under section (7a), SBA regulations, and SBA standard operating procedures.  15 U.S.C. § 636(a)(36)(h)-(J), (L); *see supra* at 4.  The PPP also requires that the SBA pay an origination fee to the lender that makes a covered loan equal to a specified percentage of the loan balance at the time of disbursement.  *Id.* § 636(a)(36)(P).

The maximum amount of a PPP covered loan is the lesser of $10,000,000 or an amount calculated as a multiple of the applicant's total monthly "payroll costs," to which the balance of any outstanding disaster loans under 15 U.S.C. § 636(b)(2) may be added.  *Id.* § 636(a)(36)(E); § 636(a)(36)(A)(viii)(I); *see* PPP Interim Final Rule at 8-10.  Section 1106 of the CARES Act provides for forgiveness of up to the full principal amount borrowed.  CARES Act § 1106(b); PPP Interim Final Rule at 1, 13.  The actual amount forgiven will depend on a borrower's payroll costs and payments for rent, utilities, and mortgage interest.  CARES Act 1106(b)(1)-(4), (d); PPP Interim Final Rule at 14.  No later than 90 days after the date on which the amount of forgiveness is determined, the SBA must remit to the lender the amount forgiven plus interest. CARES Act § 1106(c)(3).

Congress authorized the SBA to guarantee up to $349 billion-worth of loans to small businesses under this new program.  CARES Act § 1102(b)(1).

**Plaintiffs' Claims**

Plaintiffs are the American Association of Political Consultants ("AAPC"), a trade association of political consultants, lobbyists, and others that sues on behalf of its members, First

Am. Verified Compl. for Decl. & Inj. Relief ("Am. Compl."), ECF No. 8, at 1 & ¶¶ 4-5, and

Ridder/Braden, Inc. ("Ridder/Braden"), a political consulting firm and AAPC member located in

Denver, Colorado, *id.* ¶ 9.  They allege that political consulting and lobbying firms deprived of

PPP covered loans due to the operation of 13 C.F.R. § 120.110(r) "will be forced to abstain

[from] or substantially limit the exercise their constitutional right to freedom of speech … and

their right to petition government."  Am. Compl. ¶ 60.  They maintain that the SBA's rule

against federally subsidized loans for political consulting and lobbying firms is a "content-based

speech ban" that violates the free-speech clause of the First Amendment, *id.* (Claim I) ¶¶ 84-87;

that the SBA's rule unconstitutionally conditions PPP covered loans on the abandonment of their

constitutional right to free expression, and to petition the Government, *id.* (Claim II) ¶ 98; and

finally that the SBA's rule violates the Equal Protection guarantee of the Fifth Amendment

because political consulting and lobbying firms may not obtain federally subsidized PPP loans

made available to other similarly situated businesses, due solely to their exercise of fundamental

constitutional rights, *id.* (Claim III) ¶¶ 103-04.

 Based on these claims, Plaintiffs seek a preliminary injunction that prohibits the SBA

from "from enforcing 13 C.F.R. § 120.110(r) in a way that deprives business concerns or

nonprofit organizations of eligibility for [PPP covered loans] due to their political or lobbying

activities."  Proposed Order (ECF No. 2) ¶ 1.  That request should be denied.

## ARGUMENT

### I.  LEGAL STANDARDS

 A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded

as of right," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), and "may only be

awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def.*

*Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Id.* at 20.  The last two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  "When a plaintiff has not shown a likelihood of success on the merits, [we need not] consider the remaining factors."  *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).  The Supreme Court has also instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury.  Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction."  *Winter*, 555 U.S at 22.[1]

For the reasons that follow, Plaintiffs have not carried these heavy burdens.

## II.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

Plaintiffs' request for preliminary injunctive relief must be denied because they have failed to satisfy the "first and most important" requirement that the Court must consider, *Aamer*,

---

[1] In *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011), the Court of Appeals noted that *Winter* called into question the "sliding-scale approach" to consideration of the preliminary injunction factors that had been the law of this Circuit.  The Court read "*Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" such that a "movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm."  *Id.* at 392-93; *see BHM Healthcare Sols., Inc. v. URAC, Inc.*, 320 F. Supp. 3d 1, 7 (D.D.C. 2018).  Noting a split among the circuits on the interpretation of *Winter*, the Court of Appeals held that it did not need to resolve the question because the movant in *Sherley* failed to establish that a preliminary injunction was warranted even under the "less demanding sliding-scale" approach.  644 F.3d at 393.  This Court need not address this issue here, as Plaintiffs' request for preliminary relief fails under either standard.

742 F.3d at 1038:  none of their constitutional claims is likely to succeed on the merits.  To the contrary, the relief Plaintiffs seek is unprecedented.

It is a fundamental tenet of the Supreme Court's constitutional jurisprudence that "although government may not place obstacles in the path of a person's exercise" of constitutional freedoms, including "freedom of speech, it need not remove those not of its own creation." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549-50 (1983) (cleaned up).  The Government, therefore, "is not required by the First Amendment to subsidize lobbying," or any other form of speech, and does not restrict or penalize speech simply because it "has chosen not to pay for [it]." *Id.* at 546 (citing *Cammarano v. United States*, 358 U.S. 498, 513 (1959)).  *See also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas."); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right.") (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights[.]").

This bedrock principle ends this case.  Plaintiffs do not cite a single precedent in which the Government was required to fund or subsidize speech on particular topics that the Government did not wish to promote.  Yet that is exactly what Plaintiffs ask of the Court here, to compel the SBA to guarantee heavily subsidized PPP loans so that Plaintiffs may spend the proceeds on political activity and lobbying that the Government has refused subsidize for at least a quarter century.  No argument advanced or precedent cited by Plaintiffs supports that result.

### A.  Section 120.110(r) Does Not Violate the Doctrine of Unconstitutional Conditions.

Plaintiffs principally argue that the SBA's policy against financing political activities or lobbying violates the doctrine of unconstitutional conditions, by forcing political consulting and lobbying firms to forgo their First Amendment rights.  Pls.' Mem. in Supp. of Emer. Mot. for TRO & Prelim Inj. ("Pls.' Mem."), ECF No. 2, at 11-19.  This argument is meritless.

The SBA's loan programs generally, and the PPP in particular, represent an exercise of Congress's power under the Spending Clause, U.S. Const. Art, I, § 8, cl. 1.  These Government loan programs, and the considerable sums of taxpayer money that Congress appropriates to fund them, are a form of government subsidy that encourage third-party lenders to make funds available to small-business concerns that otherwise could not find credit on reasonable terms. The Spending Clause gives Congress "broad discretion to tax and spend for the 'general Welfare,'" including the authority "to impose limits on the use of [the] funds" it appropriates for particular programs or activities, "to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013).  "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds," even where the condition is one that "may affect the recipient's exercise of its First Amendment rights."  *Id.*at 214 (citing *Am. Library Ass'n*, 539 U.S. at 212).  "At the same time, however, … the Government may not deny a benefit to a [party] on a basis that infringes [its] constitutionally protected freedom of speech[.]"  *Id.* (citation omitted).

The relevant distinction, the Supreme Court has explained, is between conditions that merely "define the limits of [a] Government spending program" by "specify[ing] the activities the [Government] wants [or does not want] to subsidize"—which are permissible, *see Rust*, 500 U.S at 194—and conditions that "leverage[ ] federal funding to regulate [recipients'] speech

outside the scope of the program"—which are not.  *All. for Open Soc'y*, 570 U.S. at 214-17.  *See also Rust*, 500 U.S. at 197 (("[O]ur 'unconstitutional conditions' cases involve situations in which the Government [has imposed a funding condition] [that] effectively prohibits[s] the recipient from engaging in protected conduct outside the scope of the federally funded program.").

By way of illustrating this distinction both *Alliance for Open Society*, 570 U.S. at 215, and *Rust*, 500 U.S. at 197-98, pointed to *Regan v. Taxation With Representation*.  There the IRS had denied tax-exempt status to the plaintiff, a non-profit organization, because its intended use of tax-deductible contributions to support its lobbying activities was prohibited by section 501(c)(3) of the Internal Revenue Code.  *Regan*, 461 U.S. at 542.  The plaintiff challenged this prohibition as an unconstitutional condition imposed on its receipt of tax-deductible contributions from donors.  *Id.* at 545.  The Court had no difficulty rejecting this claim.  *See id.* at 545-46.  Treating the tax-deductibility of contributions as "similar to cash grants" to the organization, the Court concluded that the plaintiff could continue to receive tax-deductible contributions for its non-lobbying activities by forming an affiliated tax-exempt entity, under section 501(c)(4) of the Code, that would be permitted to conduct lobbying activities using sources of funds other than tax-deductible (that is, federally subsidized) contributions.  *Id.* at 544-46.  Thus, the plaintiff was not prohibited from using non-subsidized contributions to engage in lobbying, nor denied other government benefits because of its intent to lobby; "Congress ha[d] merely refused to pay for the lobbying out of public monies."  *Id.* at 545.

The situation here is the same.  The Government does not prohibit small businesses from engaging in lobbying, or political consulting, using their own funds; nor does it deny them benefits "independent [of the PPP] on account of [their] intention" to conduct such activities; it

has "merely refused to pay for [these activities] out of [PPP] monies." *Id.* That decision is perfectly constitutional.

That conclusion is reinforced by *American Library Association*, *supra.* In that action the plaintiffs challenged a federal law that required public libraries receiving federal financial assistance for the purpose of providing Internet access to install filtering software designed to block access to online pornography. *See* 539 U.S. at 198-99. The plurality rejected the contention that Congress had imposed an unconstitutional condition on the libraries' receipt of this federal assistance. *Id.* at 210-12. Congress had not "penalize[d]" libraries that chose not to install filters by denying them other, unrelated federal benefits, and the libraries remained free to offer unfiltered Internet access to their patrons using their own funds, without the benefit of federal aid. *Id.* at 212. Congress had simply decided not to subsidize unfiltered Internet access.

Likewise, under section 120.110(r), no small business is denied benefits outside the parameters of the PPP simply because it engages in political consulting or lobbying; and firms that wish to conduct these activities are free to do so using their own funds rather than Government-subsidized loans. What they cannot do is have it both ways, as Plaintiffs insist. They are not entitled to federal subsidies *and* to use those subsidies to finance activities, even expressive activities, that the Government does not wish to fund, any more than public libraries were entitled both to receive federal subsidies *and* to use those subsidies for unfiltered Internet access that the Government did not wish to pay for. Plaintiffs try to distinguish *American Library Association* on the basis that in the midst of the current "economic disaster," small firms that engage in political consulting and lobbying are unable to forgo federal financial assistance and fund their First Amendment activities using their own resources. Pls.' Mem. at 18. But that argument runs headlong into the fundamental principle that lies at the root of the unconstitutional

conditions doctrine.  As plaintiffs acknowledge, the economic obstacles to the exercise of their

First Amendment freedoms were placed in their path by the COVID-19 pandemic, *see id.*; they

are not of the Government's creation.  Therefore the Government has no constitutional obligation

to remove them.  *Regan*, 461 U.S. at 549-50.

Also instructive for purposes of analysis here is *FCC v. League of Women Voters of*

*California*, 468 U.S. 364 (1984), which was also cited by *Alliance for Open Society*, 570 U.S.

at 215-16, and *Rust*, 500 U.S. at 197, as illustrating the difference between permissible and

impermissible conditions imposed on federal grants.  In *League of Women Voters,* public

broadcasting stations that received grants from the Federal Government were prohibited by

statute from "engag[ing] in editorializing."  *See* 468 U.S. at 366.  The Supreme Court invalidated

the law because even if a non-commercial radio or television station received as little as one

percent of its income from federal grants, it was "barred absolutely" from using even its own,

"wholly private funds"—funds obtained outside the scope of the federal grant program—"to

finance its editorial activity."  *Id.* at 400.  For similar reasons, the Court struck down the funding

condition at issue in *Alliance for Open Society*, where as a condition of federal funding to

combat the HIV/AIDS pandemic, non-governmental organizations were effectively required to

express particular beliefs prescribed by the Government, even when engaged in activities outside

the program using their own sources of funding.  570 U.S. at 217-19.

Section 120.110(r) cannot be faulted on this basis.  The rule does not prohibit political

consulting or lobbying firms from using their own "wholly private funds to finance [their] [First

Amendment] activity," *League of Women Voters*, 468 U.S. at 400, and thus makes no attempt to

"leverage [PPP] funding to regulate [borrowers'] speech outside the scope of the program."  *All.*

*for Open Soc'y*, 570 U.S. at 216.  Rather, it does no more than permissibly "define the limits" of

that program by specifying activities that may not be financed with PPP loans, funds obtained *within* "the scope of the program," not outside of it. *See id.* at 214-16.

Plaintiffs' two principal arguments to the contrary are unpersuasive, at best.  First, they maintain that the Supreme Court's "subsidy" precedents are not applicable here because, in their view, PPP guaranteed loans are "not a subsidy," and confer no "financial benefit."  Pls.' Mem. at 5-17 (citing *Autor v. Pritzker*, 740 F.3d 176, 183-84 (D.C. Cir. 2014)).  That is an untenable position. The PPP makes $349 billion available to small businesses nationwide to which they would not otherwise have ready access, if at all.  The SBA's guarantee provides a powerful financial incentive to lenders to make these loans, loans they would not otherwise be willing to underwrite.  In addition, although in theory the loans must be repaid—to lenders, not to the Government, as Plaintiffs erroneously suggest, Pls.' Mem. at 16—under the CARES Act and the SBA's interim rules, the interest rate on PPP loans is capped at one percent, collateral is not required, guarantee fees are waived, and perhaps most critically, up to the full principal amount of a loan may qualify for forgiveness.  *See supra* at 5-7.  Thus the Act makes these loans far less expensive to small-business borrowers than market-rate loans would be.  Moreover, these savings for borrowers come at significant, and potentially enormous cost to taxpayers.  The SBA subsidizes every PPP loan by paying an origination fee to the lender, *see supra* at 6, and may have to pay billions of additional dollars to lenders to reimburse them for forgiven loans, and make good on SBA's guarantees in the event of borrower defaults.  *See supra* at 6, 7.

Thus, much as the deductibility of charitable donations functioned in *Regan* as government cash grants to non-profit organizations, by providing third parties an incentive to make contributions to them, *see* 461 U.S. at 544, the PPP operates as a government-funded grant program by encouraging third-party lenders to make credit available to struggling small

15

businesses on much cheaper terms than they would otherwise be willing to offer.  Plaintiffs own

affiants attest to the "financial hardship" that these loans are expected to relieve.  Robinson Aff.

(Am. Compl. Exh. D) ¶ 9; Ridder Aff. (*id.* Exh. E) ¶ 10; Karabell Aff. (*id.* Exh. F) ¶ 10.

Plaintiffs simply cannot gainsay the "financial benefit" that the PPP confers.  Pls.' Mem. at 16.

Second, Plaintiffs seek to equate the circumstances here with *Alliance for Open Society*,

and *League of Women Voters,* arguing that under section 120.110(r), political consulting and

lobbying firms are prohibited from continuing to engage in such activities even if they seek PPP

financing for other purposes unrelated to political activities or lobbying.  Pls.' Mem. at 19.  This

is a red herring.  As Plaintiff themselves remark, they have challenged section 120.110(r) "as

applied to Plaintiffs' businesses."  *Id.* at 10-11.  But neither Ridder/Braden, nor any other

member of plaintiff AAPC, identifies any business activities other than political consulting and

lobbying for which they seek to obtain PPP financing.  (Plaintiffs speak hypothetically in their

brief about using PPP funds to pay accountants and computer professionals, *see id.* at 19, but

only as staff employed to support a firm's political consulting or lobbying activities.  They do

not suggest that Ridder/Braden, or any other member of AAPC, is also in the accounting or

information-technology business, in addition to political consulting and lobbying.)  The point,

therefore, is a moot one so far as Plaintiffs here are concerned.  Having challenged the rule as it

applies to their own businesses, Plaintiffs cannot prevail on a theory that section 120.110(r)

might prevent other, hypothetical firms, simultaneously engaged in political consulting or

lobbying and some other line of work, from obtaining PPP loans.  *See Edwards v. Dist. of

Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) ("[T]o prevail on an as-applied First Amendment

challenge, [plaintiffs] must show that the [challenged] regulations are unconstitutional as applied

to their particular speech activity.").

**B.   Section 120.110(r) Is Not a Content-Based Restriction on Speech.**

Plaintiffs next contend that section 120.110(r) must be invalidated "as a content-based speech prohibition."  Pls.' Mem. at 19-27.  This claim suffers from numerous fatal flaws and also has no likelihood of success.

In the first place, section 120.110(r) is not a prohibition or restriction on speech.  It simply embodies the SBA's policy that the agency will not use federal funds to subsidize political activities and lobbying.  As explained above, the Supreme Court has held time and again that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it.  *See supra* at 10 (citing, *inter alia*, *Regan*, 461 U.S. at 546; *Am. Library Ass'n*, 539 U.S. at 212; *Rust*, 500 U.S. at 193).  Hence, Plaintiffs' reliance on such cases as *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (invalidating content-based restriction on posting of signs without a permit) as the touchstones of their analysis, *see* Pls.' Mem. at 19-22, is categorically misplaced.

The controlling principle here, articulated many times by the Supreme Court, is that the "government can make content-based distinctions when it subsidizes speech" as opposed to regulating speech.  *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007).  It has "broad discretion," in fact, "to make content-based judgments in deciding what private speech to make available to the public."  *Am. Library Ass'n*, 539 U.S. at 204-05.  *See also Nat'l Endowment for the Arts v. Finley*, 524 U.S.569, 587-88 (1998) ("[I]n the subsidy context," the Government may allocate funding "according to criteria that would be impermissible were direct regulation of speech . . . at stake[.]").  Even though content-based, the Government's funding choices will be upheld unless they are shown to be "the product of invidious viewpoint discrimination," or "aim[ed] at the suppression of dangerous ideas."  *Id.* at 586-87; *Regan*, 461 U.S. at 543-49 ("The

case would be different if Congress were to discriminate invidiously in its subsidies" with an "inten[t] to suppress any ideas."). *See also Leathers*, 499 U.S. at 447, 450-51 (1991) (explaining that "differential taxation of First Amendment speakers is constitutionally suspect [only] when it threatens to suppress the expression of particular ideas or viewpoints").

Section 120.110(a) is not subject to invalidation under these standards. The SBA's policy that it will not subsidize loans to firms engaged in the business of politics, or lobbying, is entirely viewpoint-neutral, and the rule singles out no particular ideas for disfavorable treatment. The regulation prohibits federally subsidized loans to political consulting firms regardless of the candidates, parties, or political issues they work for (or against), and regardless of what they may have to say about any topic in the course of a political campaign. Lobbyists, too, are all equally ineligible regardless of the issues on which they seek to influence legislators, or the positions they take on those issues. Plaintiffs have not shown, and cannot show, that section 120.110(r) discriminates on the basis of viewpoint, or attempts to suppress the expression of particular ideas. The rule must therefore be upheld.

Plaintiffs seek support for a contrary conclusion in *League of Women Voters*, *see* Pls.' Mem. at 21-22, but the effort fails. As Plaintiffs observe, in *League of Women Voters* the Court invalidated the editorial ban imposed on public broadcaster recipients of federal grants as a content-based restriction on free speech. 468 U.S. at 381-89. The Court took this approach, however, because Congress had barred federally subsidized broadcasters from using even their own, non-federal monies to engage in editorial speech. *See id.* at 375 ("Section 399 plainly operates to restrict the expression of editorial opinions on matters of public importance."); *id.* at 400. Congress had crossed the line from permissible subsidization of speech based on content to the unauthorized restriction of private speech based on content. As already explained, section

120.110(r) commits no such transgression.  It identifies speech of a particular type that the Government will not subsidize, without placing any restriction on consulting firms' or lobbyists' expenditures of their own funds to engage in protected expression.

Plaintiffs also find no support in *Mission Trace Investments, Ltd. v. SBA*, 622 F. Supp 687 (D. Colo. 1985) (a decision reversed on sovereign immunity grounds by the Tenth Circuit, 887 F.2d 1024 (1989)).  In *Mission Trace* the district court invalidated an SBA rule, quite different from the narrow regulation at issue here, that prohibited financial assistance to businesses "engaged in the creation, origination, expression, dissemination, propagation, or distribution of ideas, values, thoughts, opinions or similar intellectual property," with exceptions made for various types of commercial speakers.  622 F. Supp. at 689.  In reaching this decision, the court made at least three analytical missteps that cannot be reconciled with the Supreme Court's precedents.  First, it misconstrued the Supreme Court's decisions on unconstitutional conditions as standing for the proposition "that a regulation may not eliminate a benefit entirely just because a party exercises a constitutionally protected right to free speech."  *Id.* at 693-94.  In fact, as discussed, the principle that emerges from the Supreme Court's decisions is that the Government has broad discretion to withhold funding for speech that it does not wish to promote, so long as it does not attempt to restrict private expenditures on speech.  *See supra* at 11-14.  Second, compounding the first error, the court analyzed the SBA's funding rule as a content-based *restriction* on speech.  *Id.* at 696-97.  Third, it condemned the rule as viewpoint-based on the highly dubious ground that by making exceptions for certain commercial speakers, the rule favored "a particular viewpoint, materialism," over others.  *Id.* at 698-99.  In any event, as discussed, section 120.110(r) is not vulnerable to a charge of viewpoint discrimination.  Thus, *Mission Trace* offers no useful guidance for the proper decision of this case.

19

### C. Section 120.110(a) Easily Meets Equal Protection Requirements.

Finally, Plaintiffs maintain that section 120.110(r) violates Equal Protection requirements imposed on the Federal Government by the Fifth Amendment, because the rule distinguishes between small businesses that can receive PPP covered loans, and those, like Plaintiffs and their members, that cannot receive such loans, based on the latter's exercise of their fundamental constitutional right to free speech. Pls.' Mem. at 27-30. This argument is foreclosed by *Regan,* and *Ysursa.*

In *Regan* the plaintiff, in addition to raising a First Amendment challenge, also "contend[ed] that the equal protection component of the Fifth Amendment render[ed] the [section 501(c)(3)] prohibition against substantial lobbying invalid." 461 U.S. at 546. The Supreme Court held otherwise. *Id.* at 547-51. First, it rejected the conclusion that strict scrutiny of the law was required simply because it "*affect[ed]* First Amendment rights on a discriminatory basis." *Id.* at 548-49. For the reason, as the Court had already held, that a restriction limited solely to the use of federally subsidized (i.e., tax-deductible) contributions for lobbying purposes did not violate the First Amendment rights of non-profit organizations, and that the law was not evidently aimed at suppressing particular ideas, the Court concluded that it was subject only to rational-basis review, not strict scrutiny, under the Fifth Amendment. *Id.* The lobbying restriction easily withstood review under this standard, for it was "not irrational" of Congress to decide that the public interest in promoting additional lobbying by charities would not be worth the taxpayer expense. *Id.* at 550. *See also Ysursa*, 555 U.S. at 359-60 ("Given that the State has not infringed the unions' First Amendment rights" by refusing to make public employee payroll deductions for union political activities, "the State need only demonstrate a rational basis to justify [its decision].").

Section 120.110(r) must be upheld on the same grounds.  Because the rule restricts only the use of federally subsidized funds, not a firm's own monies, to engage in political activity or lobbying, and because it is neither viewpoint-based nor aimed at suppressing particular ideas, it need only withstand rational-basis review under the Fifth Amendment.  As in *Regan*, it was "not irrational" of the SBA to decide that the public benefits of subsidizing additional political speech by consultants and lobbyists would not be worth the commitment of its finite resources.  *See* 461 U.S. at 550.  The SBA's decision was also justifiable by the Government's interest in avoiding favoritism or entanglement (or even the appearance thereof) with partisan politics.  *Ysursa*, 551 U.S. at 359; *see also Cammarano*, 358 U.S. at 512-13; *supra* at 5 (discussing general Federal policy against subsidizing lobbying).

Thus, Plaintiffs' Equal Protection claim, like its other claims, exhibits no prospect of success on the merits.  For this reason alone, Plaintiffs' request for a preliminary injunction must be denied.  *Aamer*, 742 F.3d at 1038; *Greater New Orleans FHA Ctr.* 639 F.3d at 1088.

**D.  The Small Business Act Provides That "No Injunction" Shall Issue Against SBA.**

In addition to the fatal shortcomings of Plaintiffs' constitutional claims, Plaintiffs are also unlikely to succeed on the merits because Congress has restricted the availability of injunctive relief against the SBA.  Specifically, the Small Business Act provides that the SBA may

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property[.]*

15 U.S.C. § 634(b)(1) (emphasis added).  Many courts have interpreted this statute to preclude injunctive or any similar relief against the SBA, *see, e.g., Enplanar, Inc. v. Marsh,* 11 F.3d 1284, 1290 (5th Cir.1994); *Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir.1990) (explaining that

"courts have no jurisdiction to award injunctive relief against the SBA"), although others have held that this provision does not necessarily bar injunctions against the SBA in all circumstances, *see, e.g., Ulstein Mar., Ltd. v. United States,* 833 F.2d 1052, 1056–57 (1st Cir.1987).  As this Court remarked in *Digital Mgmt., Inc. v. Contreras-Sweet*, it is unnecessary to resolve questions surrounding the statute's reach at this time, because Plaintiffs have failed to show that a preliminary injunction is warranted, regardless of whether it is precluded by section 634(b)(1). 2015 WL 10458834, at *3 (D.D.C. Dec. 11, 2015).  Nevertheless, this provision casts still further doubt, if any were needed, on the likelihood of Plaintiffs' success in this case.

## III.  PLAINTIFFS HAVE NOT ADDUCED SUFFICIENT EVIDENCE OF IRREPARABLE HARM.

Plaintiffs' request for a preliminary injunction must also be denied because neither plaintiff Ridder/Braden nor any other member of AAPC has presented sufficient evidence, by affidavit or otherwise, that the injuries they assert are attributable to section 120.110(r).  *See Ass'n of Flight Attendants, CWA, v. PBGC*, 372 F.Supp.2d 91, 102 (D.D.C. 2005).

All three firms attest, of course, but in conclusory fashion, that if not for section 120.110(r) they would be "otherwise eligible to obtain a loan through the [PPP]," and in an equally conclusory manner, that they will face "financial hardship" of an unspecified nature and magnitude absent PPP loans.  Robinson Aff., ¶¶ 9, 11; Ridder Aff., ¶¶ 10, 12; Karabell Aff, ¶¶ 10, 14.  In a preliminary injunction proceeding, however, where Plaintiffs' burden is to set forth specific facts supporting their injury, they may not simply "replace conclusory allegations of [a] complaint . . . with conclusory allegations of an affidavit." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  Plaintiffs' declarations prove only that they consider themselves at risk of "financial hardship," without providing the Court any basis on which to determine for itself whether that undefined hardship rises to the level of irreparable harm.

Relying on *Elrod v. Burns*, 427 U.S. 347, 373 (197), Plaintiffs argue that "[t]he loss of [their] First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  PMO at 31-32.  This argument is also unavailing, for two independent reasons.  First, as Plaintiffs acknowledge, any "loss" of their freedom to exercise their First Amendment rights originated with "the economic turmoil that COVID-19 has inflicted on the Nation's economy." *Id.* at 9; *see also id.* at 18, 32.  Second, Plaintiffs' *Elrod* theory of injury pre-supposes that Plaintiffs have established a likelihood of success on the merits of their First Amendment claims, *see id.* at 31 (citing, *inter alia*, *Pursuing America's Greatness v. FEC (PAG)*, 831 F.3d 500, 511 (D.C. Cir. 2016)), whereas for the reasons discussed immediately above, those claims have no merit.  Thus, Plaintiffs fail under *Elrod* , as well, to demonstrate an injury entitling them to preliminary relief.

## IV.  A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO THE PUBLIC INTEREST.

Finally, to obtain preliminary injunctive relief in a case against the Government, Plaintiffs must show that an injunction prohibiting application of section 120.110(r) under the Paycheck Protection Program would be in the public interest.  *Nken*, 556 U.S. at 435.  Plaintiffs cannot make that showing, because Congress has already determined that the SBA should continue to apply the restrictions on eligibility codified under section 120.110 when administering the PPP.

As discussed *supra*, at 6-7, when Congress passed the CARES Act, it decided that PPP covered loans should be made under the same terms and conditions as other SBA section 7(a) loans, "[e]xcept as otherwise provided" in the PPP.  15 U.S.C. § 636(a)(36)(B).  The PPP sets forth in careful detail which provisions of section 7(a), and the SBA's implementing regulations, are waived or modified for purposes of making PPP covered loans.  *Id*. § 636(a)(36)(D)-(R).

23

Section 120.110 is not among them.  Thus, Congress already decided that the substantial but not unlimited amount of funding available for PPP covered loans would be best reserved for small businesses other than the 18 types of businesses designated under section 120.110, all of which have become accustomed to doing business without access to SBA subsidies for a quarter century or more.

Plaintiffs offer no justification for disturbing that legislative judgment.  Plaintiffs invoke their desire to exercise their freedom of expression, Pls.' Mem. at 33-34, but they are playing a zero-sum game.  Where the demand for PPP covered loans exceeds the available funds, PPP financing allocated to Plaintiffs necessarily would come at the cost of denying it to others seeking the same assistance.  The fact that Plaintiffs and the firms they represent are engaged in expressive activities does not entitle them to overturn Congress's funding choices, or to receive government largesse at the expense of others—waiters, waitresses, hotel workers, retail staff, and the like—who are just as much in need of the Government's economic assistance in this time of crisis as are Plaintiffs, if not more so.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction should be denied.

Dated:  April 17, 2020

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ERIC WOMACK
Assistant Director


 */s/ James J. Gilligan*
JAMES J. GILLIGAN
Special Litigation Counsel

Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883
Washington, D.C. 20044

Telephone:  (202) 514-3358
E-mail:       james.gilligan@usdoj.gov

*Counsel for Defendant*