**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|   |   |   |
|---|---|---|
| AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS, *et al.*,   Plaintiffs,   v.   UNITED STATES SMALL BUSINESS ADMINISTRATION, *et al.*,   Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Case No. 20-970 |

## MEMORANDUM OPINION

Before the Court are plaintiffs' motions for a temporary restraining order and a preliminary injunction. Plaintiffs seek to enjoin defendants from enforcing an allegedly unconstitutional regulation prohibiting organizations involved in political consulting and lobbying from receiving loans or grants from the United States Small Business Administration ("SBA"). Plaintiffs filed the instant case in response to the passage of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), which provided the SBA with $349 billion to disseminate aid to small businesses struggling to make ends meet during the COVID-19 crisis.

Plaintiffs claim that the regulation violates the First Amendment—because it unlawfully restricts political speech—and the equal protection principles contained in the Fifth Amendment's Due Process Clause. The regulation in question is twenty-four-years-old and, to the Court's knowledge, has yet to be challenged on these grounds. Defendants argue that the regulation is

constitutional and that plaintiffs' motions should be denied because plaintiffs have failed to make the requisite showing for injunctive relief.

On April 20, 2020, the Court heard oral arguments via teleconference. Upon consideration of the parties' arguments and their briefs, the Court will deny plaintiffs' motions for injunctive relief.

## **Background**

The COVID-19 pandemic has shaken this nation to its core. The virus has taken the lives of thousands of Americans and permanently altered the lives of many more. COVID-19 has unquestionably had—and continues to have—a devastating impact on our nation's economy. As doctors, nurses, first responders, and other heroes fight this scourge on the front lines, the federal government sprang into action to provide an economic stimulus for our nation's businesses and citizens. On March 27, 2020, President Trump signed the CARES Act into law.

At issue here is the financial relief the CARES Act provides for small businesses through the Paycheck Protection Program ("PPP"). Section 1102(a)(2) of the CARES Act adds a new paragraph to Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36), which provides that "[e]xcept as otherwise provided in this paragraph, the [SBA] may guarantee [PPP] covered loans under the same terms, conditions, and processes as a loan made under this subsection." 15 U.S.C. § 636(a)(36)(B). Following that, the CARES Act details the ways in which PPP covered loans differ from other Section 7(a) loans. *See id.* § 636(a)(36)(D)–(R). For example, the PPP authorizes the SBA to make covered loans to some non-profit organizations, veterans organizations, independent contractors, and self-employed individuals, as well as to small business and Tribal concerns. *Id.* § 636(a)(36)(D)(i), (ii). The PPP also relaxes size limitations to allow businesses

with as many as 500 employees—or even more, depending on their industry—to receive loans. *Id.* § 636(a)(36)(D)(i)(I), (II).

PPP loans are no ordinary loans. The CARES Act caps the chargeable rate of interest of a covered loan at four percent, but the SBA subsequently capped the rate further to only one percent. *Id.* § 636(a)(36)(L); PPP Interim Final Rule at 11, ECF No. 17-2. The Act also waives the no credit elsewhere, personal guarantee, collateral, and guaranteed loan fee requirements normally imposed on businesses seeking an SBA loan. 15 U.S.C. § 636(a)(36)(H)–(J).

The maximum amount of a PPP covered loan is the lesser of $10,000,000 or an amount calculated as a multiple of the applicant's total monthly "payroll costs," to which the balance of any outstanding disaster loans under 15 U.S.C. § 636(b)(2) may be added. *Id.* §§ 636(a)(36)(E), 636(a)(36)(A)(viii)(I); *see* PPP Interim Final Rule at 8–10. The CARES Act also provides for forgiveness of up to the full principal amount borrowed. CARES Act § 1106(b); PPP Interim Final Rule at 1, 13. The amount forgiven depends on the borrower's payroll costs and payments for rent, utilities, and mortgage interest. CARES Act § 1106(b)(1)–(4), (d); PPP Interim Final Rule at 14. The Act requires the SBA to remit to the lender the amount forgiven plus interest. CARES Act § 1106(c)(3). Congress authorized the SBA to guarantee up to $349 billion of PPP loans to small businesses. CARES Act § 1102(b)(1).

The SBA has determined as a matter of policy that Section 7(a) loans should not be available to certain types of businesses. *See* 13 C.F.R. § 120.110 (listing eighteen types of excluded business concerns). For example, non-profit businesses, other lenders, and businesses in which the lender owns an equity interest, to name a few, are ineligible for Section 7(a) loans. *See id.* In this case, plaintiffs are challenging Section 120.110(r), which deems "[b]usinesses primarily

engaged in political or lobbying activities" ineligible to receive Section 7(a) loans. *Id.* § 120.110(r).

The reasoning behind Section 120.110(r) is not controversial—the twenty-four-year-old regulation is being challenged now for the first time. As defendants note,

> [t]he SBA first decided that firms primarily engaged in political activities or lobbying should be deemed ineligible for SBA general business loans almost a quarter century ago, in January 1996, *see* 61 Fed. Reg. 3226-02, 3229-40 (Jan. 31, 1996) (final rule); 60 Fed. Reg. 64356, 64359 (Dec. 15, 1995) (proposed rule). It did so in accordance with its mandate under the Small Business Act to establish general policies that direct its limited financial resources in ways that will best serve the public interest, *see* 15 U.S.C. § 633(d); 60 Fed. Reg. at 64360, and with longstanding U.S. Government policy that "Federal funds [should] not be used for lobbying or political activities because to do so would not be an appropriate or cost-effective use of Federal tax dollars." *See* 51 Fed. Reg. 37580-01, 37589 (Oct. 23, 1986).

Defs.' Mem. Opp. 5, ECF No. 15.

Plaintiffs are the American Association of Political Consultants ("AAPC"), a trade association of political consultants, lobbyists, and others, Am. Compl. ¶¶ 4–5, ECF No. 8, and Ridder/Braden, Inc. ("Ridder/Braden"), a political consulting firm and AAPC member located in Denver, Colorado, *id.* ¶ 9. They allege that political consulting and lobbying firms deprived of PPP covered loans due to Section 120.110(r) "will be forced to abstain or substantially limit the exercise [of] their constitutional right to freedom of speech . . . and their right to petition government." Am. Compl. ¶ 60. Plaintiffs seek to enjoin the SBA from enforcing Section 120.110(r) as to their PPP applications. *See* Pls.' TRO/PI Mots. 1–2, ECF No. 2.

## **Discussion**

Injunctive relief is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant bears the burden of demonstrating that: (1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not

granted; (3) the balance of equities tips in its favor; and (4) the public interest would be furthered by the injunction.  *Id.* at 20.  The last two factors (the balance of equities and public interest) "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Court considers the same factors in deciding whether to issue a temporary restraining order as it does when deciding whether to issue a preliminary injunction.  *Baker DC, LLC v. NLRB*, 102 F. Supp. 3d 194, 198–99 (D.D.C. 2015).

   a. ***Likelihood of Success on the Merits***

Plaintiffs challenge 13 C.F.R. § 120.110(r) on three different grounds: (1) it violates the unconstitutional conditions doctrine because it compels them to forego their fundamental constitutional rights to obtain a loan; (2) it is a content-based speech ban that cannot survive strict scrutiny; and (3) it violates the equal protection principles contained in the Fifth Amendment.  Pls.' TRO/PI Mots. 2.

   1. Unconstitutional Conditions Doctrine

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  Plaintiffs argue that Section 120.110(r) is an unconstitutional condition and therefore violates their First Amendment right to engage in political speech.

The SBA's loan programs, including the PPP, represent the exercise of Congress' authority vested by the Spending Clause.  *See* U.S. Const. Art, I, § 8, cl. 1.  The Spending Clause gives Congress "broad discretion to tax and spend for the 'general Welfare,'" which encompasses the authority "to impose limits on the use of [the] funds" it appropriates for particular programs or activities, "to ensure they are used in the manner Congress intends."  *Agency for Int'l Dev. v. All.*

*for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds," even if the condition "may affect the recipient's exercise of its First Amendment rights." *Id.* at 214 (citing *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003)). "At the same time, however, . . . the Government may not deny a benefit to a [party] on a basis that infringes [its] constitutionally protected . . . freedom of speech[.]" *Id.* (citations and quotation marks omitted).

The natural starting point in this Court's analysis is *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983), because of its many similarities to this case. In *Regan*, the Supreme Court upheld a requirement that nonprofit organizations seeking tax-exempt status under 26 U.S.C. § 501(c)(3) not engage in substantial efforts to influence legislation because the tax-exempt status "ha[d] much the same effect as a cash grant to the organization." 461 U.S. at 544. The Court was unconvinced by the organization's First Amendment claim—Congress had not limited the organization's ability to lobby the government in any way. *See id.* at 545. According to the Court, Congress merely "chose not to subsidize lobbying" in limiting the availability of Section 501(c)(3) tax-exempt status in this way. *Id.* at 544. The Court reasoned that "'although government may not place obstacles in the path of a [person's] exercise of . . . freedom of [speech], it need not remove those not of its own creation.'" *Id.* at 549–50 (alterations in original) (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)).

In this case, the COVID-19 crisis—and not the federal government—directly or indirectly created the financial obstacles which may threaten plaintiffs' ability to engage in future political speech. And so, because the federal government did not place any obstacles in plaintiffs' paths, defendants argue that the federal government made a constitutionally valid decision to deny SBA subsidies to organizations engaged in political consulting and lobbying. But plaintiffs dispute the

direct application of *Regan*'s holding to this case because PPP loans should not be treated as subsidies. *See* Pls.' TRO/PI Mots. 15–16. The Court disagrees.

Plaintiffs point out that the CARES Act calls these financial benefits "loans" and not "subsidies." *See id.* This is a distinction without a difference. A subsidy need not be called a subsidy for purposes of the law. For example, in *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009), the Supreme Court upheld an Idaho statute prohibiting government employees from deducting a portion of their salary from their paychecks for union political activities. *Id.* at 355. The statute did not violate the First Amendment because the Court treated the payroll deduction as a subsidy and employed the same reasoning as the Court in *Regan*: Idaho was "not required to assist others in funding the expression of particular ideas, including political ones." *Id.* at 1098. So, although voluntary payroll deductions are not, by definition, the same as subsidies, the Supreme Court applied the principle of permitting the government to decline subsidizing political speech in *Ysursa* as well.[1]

As the Court already noted, PPP loans are no ordinary loans. The interest rate on PPP loans is capped at one percent; collateral is not required; guarantee fees are waived; and up to the full principal amount of a loan may qualify for forgiveness. 15 U.S.C. § 636(a)(36)(H)–(J), (L); CARES Act § 1106(b); PPP Interim Final Rule at 1, 13. The forgiven amount depends on the borrower's payroll costs and payments for rent, utilities, and mortgage interest. CARES Act § 1106(b)(1)–(4), (d); PPP Interim Final Rule at 14. There is no doubt that PPP loans confer a financial benefit not otherwise available to businesses in the open market. This is, of course, the

---

[1] Plaintiffs' attempts to analogize this case to *Matal v. Tam*, 137 S. Ct. 1744 (2017), fall short. Plaintiffs are seeking an influx of cash through a specially enacted loan program. These facts are much more in line with *Regan* than with *Matal*, where the respondent sought to trademark his band's derogatory name. *Matal*, 137 S. Ct. at 1751. Furthermore, as defendants noted during oral arguments, those who apply for trademarks must pay fees, *see id.* at 1761, so the acquisition of a trademark can hardly be seen as a subsidy in the traditional sense. *Regan* is the most analogous case to ours, and the Court's ruling here is in accordance with it.

point of an economic stimulus—to prop up the economy while the private sector struggles to provide gainful employment to Americans seeking work.

To the Court, there is no meaningful difference between the financial benefits sought by plaintiffs here and the lobbyists in *Regan*: the government's decision to leave Section 120.110(r) undisturbed when deciding which industries to stimulate is analogous to the government's decision to deny tax-exempt status to non-profit lobbyist organizations.

Furthermore, PPP loans are not only legally equivalent to subsidies for theoretical purposes, but also in practice. The affiants in this case declared that they require PPP loans to pay employees' salaries, as well as rent and utility expenses. Robinson Aff. ¶¶ 16–17, ECF No. 8-1; Ridder Aff. ¶ 18, ECF No. 8-1; Karabell Aff. ¶ 19, ECF No. 8-1. These types of expenses qualify for loan forgiveness under the CARES Act. So, if the Court permits these affiants to receive PPP loans, it is almost certain that at least some portion of their loans would then be forgiven. These loans are, in effect, subsidies. The Court is therefore bound by the principles articulated in *Regan* and holds that plaintiffs are unlikely to succeed on the merits of this claim.

2. Content-Based Speech Ban

Next, plaintiffs argue that Section 120.110(r) is a content-based speech ban that cannot survive strict scrutiny. *See* Pls.' TRO/PI Mots. 26. "Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015); *see also Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (stating that the First Amendment prohibits "attempts to disfavor certain subjects or viewpoints"). Plaintiffs claim that Section 120.110(r) unlawfully disfavors plaintiffs' political speech.

Plaintiffs' arguments are unlikely to prevail because, as discussed above, Section 120.110(r) is not a prohibition or restriction on speech. Section 120.110(r) is merely an embodiment of the SBA's longstanding policy that the agency should not use federal funds to subsidize political consulting and lobbying. Although "content-based regulations of speech are presumptively invalid," the Supreme Court has held that the federal government can "make content-based distinctions when it subsidizes speech." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188–89 (2007); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998) (stating that the government may, in the subsidy context, allocate funding "according to criteria that would be impermissible were direct regulation of speech . . . at stake"). Even though content-based, the federal government's funding choices here should be upheld unless they are "the product of invidious viewpoint discrimination," or "aim[ed] at the suppression of dangerous ideas." *Nat'l Endowment for the* Arts, 524 U.S. at 587 (internal quotation marks omitted) (quoting *Regan*, 461 U.S. at 550).

Section 120.110(r) is viewpoint-neutral and does not suppress certain ideas or beliefs in favor of others. It articulates that the government will not subsidize political consultants and lobbyists, regardless of their affiliations or viewpoints, with SBA loans. Plaintiffs are therefore unlikely to succeed on the merits of this claim as well.

3. Equal Protection

Finally, plaintiffs argue that Section 120.110(r) violates the equal protection principles contained in the Fifth Amendment's Due Process Clause. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). They claim that Section 120.110(r) must be examined under strict scrutiny because it creates an unlawful classification based on plaintiffs' constitutionally protected rights and has

subjected plaintiffs to unconstitutional differential treatment. According to plaintiffs, Section 120.110(r) cannot survive strict scrutiny.

But these arguments also assume that Section 120.110(r) restricts plaintiffs' constitutional rights in the first place. Because Section 120.110(r) restricts only the use of federally subsidized funds, and not private funds, to engage in political speech, and because Section 120.110(r) is viewpoint-neutral, it need only withstand rational-basis review under the Fifth Amendment. *See Ysursa*, 551 U.S. at 359. As the Supreme Court articulated in *Regan*, it was "not irrational" for the government to decide that the public benefits of subsidizing political speech by consultants and lobbyists would not be worth the commitment of its finite resources. *See* 461 U.S. at 550. Section 120.110(r) could easily withstand rational-basis scrutiny on these grounds alone. Additionally, the SBA's "interest in avoiding the reality or appearance of government favoritism or entanglement with partisan politics" easily withstands rational-basis scrutiny as well. *Ysursa*, 551 U.S. at 359. As such, plaintiffs are unlikely to succeed on the merits of their final claim.

4. <u>Availability of Injunctive Relief Against the SBA</u>

Defendants also argue that plaintiffs are unlikely to succeed on the merits because Section 634(b)(1) of the Small Business Act restricts the availability of injunctive relief against the SBA. Section 634(b)(1) states that the SBA may

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property[.]

15 U.S.C. § 634(b)(1).

Other circuits are split on how to interpret Section 634(b)(1). Some courts have interpreted it to preclude all injunctive relief against the SBA, *see, e.g.*, *Enplanar, Inc. v. Marsh*, 11 F.3d 1284,

1290 (5th Cir. 1994); *Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) (explaining that "courts have no jurisdiction to award injunctive relief against the SBA"), but others have held that Section 634(b)(1) does not necessarily bar injunctions against the SBA in all circumstances, *see, e.g.*, *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir. 1987).

The D.C. Circuit has yet to take a clear position on this issue, but at a minimum it has "strongly intimated that injunctive relief is available . . . when the SBA exceeds its statutory authority." *Elk Assocs. Funding Corp. v. U. S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 20 (D.D.C. 2012). The Court need not take a position on this question because plaintiffs are unlikely to succeed on the merits of their constitutional challenges. *See id.* at 22. But the Court notes that the existence of Section 634(b)(1) casts at least some doubt on the availability of plaintiffs' requested relief.

5. Mootness

The Court is aware of press accounts that the original allocation of money by Congress for this program has already been expended and that Congress may be on the verge of authorizing additional funds. The issue of mootness has not been raised by the parties, and it seems likely to be moot one day and ripe another day, depending on the actions of Congress. The Court does not address mootness *sua sponte* today.

### b. Threat of Irreparable Harm

Plaintiffs argue that the restriction of their First Amendment rights constitutes an irreparable harm. As the Supreme Court noted in *Elrod v. Burns*, 427 U.S. 347 (1976), "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373. But this argument assumes that the government is unlawfully

11

restricting plaintiffs' constitutional rights by continuing to exclude political consultants and lobbyists from receiving SBA benefits. For the reasons discussed above, this is not the case.

Plaintiffs point out that "[i]n First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotations omitted); *see also Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) ("When a plaintiff has not shown a likelihood of success on the merits, [we need not] consider the remaining factors.").

But the Court examined the affidavits attached to the complaint for evidence of irreparable financial harm nonetheless. The Court agrees with defendants here as well. To be considered irreparable, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The affidavits in this case contain mostly conclusory statements about the financial hardships the affiants are facing. *See* Robinson Aff. ¶ 9; Ridder Aff. ¶ 10; Karabell Aff. ¶ 10. The Court has no way of measuring whether these hardships are imminent and irreparable without access to more detailed financial documentation. As such, this factor also weighs in defendants' favor.

c. *Balance of Equities and Public Interest*

Plaintiffs argue that the balance of equities and public interest factors weigh in their favor because plaintiffs are seeking to exercise their constitutional rights and the SBA has no interest in the enforcement of an unconstitutional regulation. *See* Pls.' TRO/PI Mots. 33–34. This argument

assumes that the SBA is preventing plaintiffs from petitioning the government and engaging in political speech.  But as the Court has held, the SBA has done no such thing.

In passing the CARES Act, Congress chose not to alter the restrictions set forth in Section 120.110(r).  The Executive and Legislative Branches quickly responded to the COVID-19 crisis with this virtually unanimous legislation.  For the Judicial Branch to intervene now and issue the requested injunction under these circumstances would not be in the public interest.  Suddenly finding a constitutional right in a twenty-four-year-old regulation that has never even been litigated before and that was not suddenly enacted to deal with this crisis is something that the Judicial Branch should not do.  Accordingly, these final factors also weigh in defendants' favor.

## Conclusion

Plaintiffs have not made the requisite showing to justify the extraordinary remedy of injunctive relief, so the Court must deny their motions.  In denying plaintiffs' motions, the Court does not seek to understate the financial hardships that political consultants, lobbyists, and their staff are experiencing.  These are trying times.  Businesses and individuals of all trades are suffering from the detrimental effects of this pandemic.  But the Court is bound by existing precedent and cannot enjoin a constitutionally valid regulation on account of financial hardship.

Plaintiffs' motions for a temporary restraining order and a preliminary injunction are hereby **DENIED**.  A separate order follows.


Date:   April 21, 2020                                      /s/
                                                    Royce C. Lamberth
                                                    United States District Judge